**WO**

# IN THE UNITED STATES DISTRICT COURT

# FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| ThermoLife International LLC, | No. CV-18-02980-PHX-DWL |
| Plaintiff, | **ORDER** |
| v. | |
| NeoGenis Labs Incorporated, | |
| Defendant. | |
| NeoGenis Labs, Incorporated, | |
| Counter-Claimant, | |
| v. | |
| ThermoLife International, LLC and Ronald L. Kramer, | |
| Counter-Defendants. | |

## INTRODUCTION

ThermoLife International, LLC ("ThermoLife") and Human Power of N Company (formerly known as NeoGenis Labs, Inc.) ("HumanN") each hold patents related to the use of nitrate technology.  In this action, ThermoLife alleges that HumanN has engaged in false advertising and false marking by, among other things, marking three of its nitrate-related products with inapplicable patent numbers, in violation of state and federal law.  (Doc. 68.) HumanN denies ThermoLife's allegations and has asserted an array of counterclaims against ThermoLife and its founder, Ronald L. Kramer ("Kramer").  (Doc. 83.)  The

1    counterclaims are based in part on a previous, unsuccessful lawsuit that ThermoLife filed

2    against HumanN, in part on a press release that Kramer issued after this lawsuit was filed,

3    and in part on ThermoLife's alleged interference with HumanN's business relationship

4    with Amazon.com.

5            Now pending before the Court is ThermoLife's and Kramer's motion to dismiss the

6    counterclaims and to strike certain factual allegations within HumanN's pleading.  (Doc.

7    97.)  For the following reasons, the motion to dismiss will be granted in part and denied in

8    part and the motion to strike will be denied.

9                                          **BACKGROUND**

10   I.    <u>Underlying Facts</u>

11           ThermoLife and HumanN are entities operating in the sphere of nitrate

12   supplementation and technology.  Kramer is ThermoLife's founder.

13           The following allegations, which are assumed to be true for purposes of

14   ThermoLife's motion to dismiss unless contradicted by matters properly subject to judicial

15   notice, are derived from HumanN's counterclaims.  (Doc. 83 at 36-64.)  HumanN licenses

16   patents from the University of Texas related to nitric oxide ("N-O") technology.  (*Id.* ¶ 16.)

17   "Relying on its patented N-O technology," HumanN has created an array of products,

18   including a nutritional supplement called Neo40 and functional foods called BeetElite and

19   SuperBeets.  (*Id.* ¶¶ 17, 19.)

20           In March 2016, HumanN received a demand letter from ThermoLife alleging that

21   Neo40 infringed a patent, U.S. Patent No. 9,180,140 ("the '140 patent"), that was licensed

22   by ThermoLife.  (*Id.* ¶ 43.)  The demand letter was accompanied by an infringement review

23   that purported to show that Neo40 infringed the '140 patent.  (*Id.* ¶ 45.)

24           In fact, HumanN "never practiced" the '140 patent and thus couldn't have infringed

25   it.  (*Id.* ¶ 44.)  Additionally, the infringement review contained a claim chart that "directly

26   negat[ed] ThermoLife's claims of infringement."  (*Id.* ¶ 45.)  Specifically, the '140 patent

27   covers administration of specific doses of an inorganic nitrate or nitrite "with a result of

28   improved physical performance during exercise and reduced oxygen consumption (VO2),"

yet the study ThermoLife cited to support its infringement allegation "found that Neo40 did not reduce oxygen consumption and, in fact, increased it." (*Id.* ¶¶ 46, 49.)

HumanN responded to ThermoLife's demand letter by explaining why Neo40 did not infringe the '140 patent. (*Id.* ¶ 50.) Nonetheless, ThermoLife sued HumanN in June 2016 for patent infringement. (*Id.*) The litigation was stayed in September 2016, however, when the U.S. Patent & Trademark Office (the "PTO") instituted proceedings to reexamine the '140 patent. (*Id.* ¶ 51.)

In December 2016, while the '140 patent was being reexamined, Kramer sent a letter to HumanN to "open a dialogue for possible resolution" of the litigation. (*Id.* ¶ 52.) Kramer "threatened to bring a false advertising suit" if HumanN did not, among other things, settle the litigation. (*Id.* ¶ 53.) Kramer also threatened another infringement suit based on two additional patents if "HumanN did not . . . negotiate a deal." (*Id.*) And, at some point during the interactions between ThermoLife and HumanN, Kramer and ThermoLife "promise[d] to stifle competition for HumanN if HumanN agree[d] to a sub-license, and alternatively threatened to drive HumanN out of business entirely if it [did] not." (*Id.* ¶ 42.)

In January 2018, ThermoLife voluntarily dismissed its infringement suit related to the '140 patent. (*Id.* ¶¶ 54, 62.) Nevertheless, ThermoLife continued to "demand that HumanN sub-license a patent it did not practice." (*Id.* ¶ 62.)

ThermoLife also took other steps to disrupt HumanN's business relationships. (*Id.* ¶¶ 64, 69.) In March 2019, ThermoLife told Amazon that HumanN's products infringed another of ThermoLife's patents (the '531 patent). (*Id.*) In response, Amazon took down some of HumanN's product listings. (*Id.* ¶ 71.) This caused HumanN to expend "significant efforts to restore its product pages," rendered HumanN "unable to sell three of its top selling products on Amazon" for one month, and diminished HumanN's seller ranking. (*Id.* ¶¶ 72-73.)

HumanN declined to pursue a license from ThermoLife. (*Id.* ¶ 66.) This litigation followed. (*Id.*) After filing suit, ThermoLife issued a press release entitled "ThermoLife

Serves HumanN A Beet Down For Selling Falsely Advertised And Misbranded Products Including SuperBeets, BeetElite, And Neo40." (*Id.* ¶ 74.)  HumanN alleges this press release contained false or misleading representations. (*Id.*)

II.   Procedural History

On September 20, 2018, ThermoLife initiated this action by filing a complaint alleging that HumanN (1) falsely marked products in violation of 35 U.S.C. § 292, (2) falsely advertised products in violation of the Lanham Act, 15 U.S.C. § 1125(a)(1)(B), and (3) engaged in unfair competition in violation of Arizona law. (Doc. 1.)  The case was eventually assigned to Judge Holland. (Doc. 12.)

On January 9, 2019, HumanN filed a motion to dismiss for failure to state a claim. (Doc. 24.)  HumanN argued, among other things, that ThermoLife had not established a competitive or commercial injury sufficient to confer standing for its false marking and false advertising claims. (*Id.* at 7-10.)

On April 1, 2019, the Court granted HumanN's motion to dismiss but also granted ThermoLife leave to amend. (Doc. 40.)[1]

On April 26, 2019, ThermoLife filed its First Amended Complaint ("FAC"), asserting the same three claims against HumanN. (Doc. 43.)

On May 24, 2019, HumanN moved to dismiss the FAC for failure to state a claim. (Doc. 49.)

On September 4, 2019, the Court granted in part and denied in part HumanN's motion to dismiss the FAC. (Doc. 63.)  The Court held that ThermoLife had failed to allege a competitive injury in its claims concerning a product called "N-O Indicator Strips" because ThermoLife did not begin efforts to enter the nitric-oxide test strip market until after it commenced this lawsuit. (*Id.* at 9-10, 19, 25.)  The Court did not give ThermoLife leave to amend this facet of its claims. (*Id.* at 11-12, 19.)  The Court also dismissed ThermoLife's false advertising and unfair competition claims as to allegations that (1)

---

[1]     HumanN raised other arguments for dismissal based on plausibility of the claims, which the Court declined to consider. (Doc. 40 at 16 n.42.)

HumanN falsely advertises itself as the sole company that can practice patented N-O platform technology and (2) HumanN's products are foods or dietary supplements as defined by the FDA.  (*Id.* at 26.)  The Court granted ThermoLife leave to amend these aspects of its claims and denied the rest of HumanN's motion to dismiss.  (*Id.*)

On September 30, 2019, ThermoLife filed its Second Amended Complaint ("SAC"), again asserting the same three claims against HumanN.  (Doc. 68.)

On December 4, 2019, the Court granted the parties' joint motion to stay the case so the parties could engage in settlement discussions.  (Doc. 76.)  The Court subsequently extended the stay several times at the parties' joint request.  (Docs. 78, 80, 82.)

The parties were unable to resolve the dispute.  Accordingly, on February 19, 2020, HumanN filed its answer to the SAC and counterclaims against ThermoLife and Kramer.  (Doc. 83.)

On February 20, 2020, the case was reassigned to the undersigned judge.  (Doc. 85.)

On April 15, 2020, ThermoLife filed a combined motion to strike certain allegations in the counterclaims and motion to dismiss all seven counterclaims.  (Doc. 97.)[2]  Afterward, HumanN filed its response (Doc. 103), and ThermoLife filed a reply (Doc. 108).[3]

## DISCUSSION

I.   <u>Motion To Dismiss</u>

HumanN has asserted seven counterclaims against ThermoLife and Kramer.  Count I is a claim for attempted monopolization under the Sherman Act.  (Doc. 83 ¶¶ 79-87.) Count II is a claim for false advertising under the Lanham Act.  (*Id.* ¶¶ 88-97.)  Count III is a state-law claim for unfair competition.  (*Id.* ¶¶ 98-104.)  Count IV is a state-law claim for civil extortion.  (*Id.* ¶¶ 105-11.)  Count V is a state-law claim for tortious interference with business expectancy.  (*Id.* ¶¶ 112-21.)  Count VI is a state-law claim for trade libel. (*Id.* ¶¶ 122-26.)  Count VII is a claim for violation of Arizona's Patent Troll Prevention

---

[2]   Before the Court is ThermoLife's amended motion to strike and motion to dismiss (Doc. 97), not its original filing (Doc. 96).

[3]   The Court rules on this motion without oral argument because neither party requested it (Docs. 97, 103, 108).  *See* LRCiv. 7.2(f).

1   Act.  (*Id.* ¶¶ 127-35.)  ThermoLife moves to dismiss all seven counterclaims.  (Doc. 97.)

2         A.  **Judicial Notice**

3         As a preliminary matter, HumanN objects to two of the exhibits that were attached

4   to ThermoLife's motion to dismiss.  (Doc. 103 at 3-4.)  The first challenged exhibit, Exhibit

5   C, is a collection of documents that ThermoLife filed in a different lawsuit or series of

6   lawsuits (which the parties variously refer to as "*Myogenix*" and "the Stanford Litigation"),

7   including a declaration that was stricken by the court in that matter.  (Doc. 97-1 at 53-109).

8   According to HumanN, these materials are not properly before the Court because

9   ThermoLife is seeking to rely on them to prove the truth of the factual statements contained

10  within them and to disprove the factual allegations underlying its counterclaims.  The

11  second challenged exhibit, Exhibit F, is an email exchange between Kramer and Joel

12  Kocher, HumanN's CEO.  (Doc. 97-1 at 185-88).  According to HumanN, this email is not

13  subject to judicial notice, and therefore cannot be considered, because it is not referenced

14  in the counterclaims.

15        In its reply, ThermoLife argues that its reliance on Exhibit C is permissible because

16  "HumanN's factual basis for its allegation of 'patent trolling' is supported only by cherry-

17  picked portions of the docket in the Stanford Litigation taken out of context" and the Court

18  is therefore entitled to "take judicial notice of additional filings from the Stanford Litigation

19  which show, as a matter of public record, that the 'real facts' are: ThermoLife is not a

20  patent troll."  (Doc. 108 at 2.)  ThermoLife also contends that although its declaration in

21  the Stanford Litigation was stricken by the court, "the undisputed facts stated in that struck

22  declaration show that ThermoLife practiced the patents and is not a patent troll."  (*Id.* at 3.)

23  As for Exhibit F, ThermoLife does not respond to HumanN's arguments.

24        "When ruling on a Rule 12(b)(6) motion to dismiss, if a district court considers

25  evidence outside the pleadings, it must normally convert the 12(b)(6) motion into a Rule

26  56 motion for summary judgment, and it must give the nonmoving party an opportunity to

27  respond."  *United States v. Ritchie*, 342 F.3d 903, 907 (9th Cir. 2003).  However, a court

28  may consider "certain materials—documents attached to the complaint, documents

incorporated by reference in the complaint, or matters of judicial notice—without converting the motion to dismiss into a motion for summary judgment." *Id.* at 908.  Here, the materials contained within Exhibit C were not attached to HumanN's answer/counterclaim or incorporated by reference in that pleading, so ThermoLife may rely on those materials only to the extent they are subject to judicial notice.  Although it is true that courts "may take judicial notice of court filings," *Reyn's Pasta Bella, LLC v. Visa USA, Inc.*, 442 F.3d 741, 746 n.6 (9th Cir. 2006), it is impermissible to "take judicial notice of disputed facts contained in such public records," *Khoja v. Orexigen Therapeutics, Inc.*, 899 F.3d 988, 999 (9th Cir. 2018).  That is essentially what ThermoLife is seeking here— it is not merely asking the Court to take judicial notice of the fact that it made certain filings during the Stanford Litigation but instead asks the Court to assume the truth of the disputed factual assertions contained within those filings.  Thus, the Court will only consider Exhibit C for the limited purpose of establishing that ThermoLife made certain filings during the Stanford Litigation.  *Cf. Avila v. LifeLock Inc.*, 2016 WL 4157358, *3 n.3 (D. Ariz. 2016) (refusing to take judicial notice of the truth of factual assertions contained in a declaration filed in a different lawsuit).

As for Exhibit F, ThermoLife makes no effort to show that the email is properly before the Court and the Court agrees with HumanN that it is not.  The email was not attached to HumanN's pleading or incorporated by reference in that pleading and it is not subject to judicial notice.  *Ritchie*, 342 F.3d at 907-08.

B.   **Legal Standard**

To survive a motion to dismiss under Rule 12(b)(6), "a party must allege 'sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face.'"  *In re Fitness Holdings Int'l, Inc.*, 714 F.3d 1141, 1144 (9th Cir. 2013) (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)).  "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."  *Id.* (quoting *Iqbal*, 556 U.S. at 678).  "[A]ll well-pleaded allegations of material fact in the complaint are accepted as true and are construed

in the light most favorable to the non-moving party." *Id.* at 1144-45 (internal quotation marks omitted).  However, the court need not accept legal conclusions couched as factual allegations.  *Iqbal*, 556 U.S. at 679-80.  The court also may dismiss due to "a lack of a cognizable legal theory." *Mollett v. Netflix, Inc.*, 795 F.3d 1062, 1065 (9th Cir. 2015) (internal quotation marks omitted).

C.   **Counterclaim I**

Counterclaim I is a claim against ThermoLife and Kramer for attempted monopolization in violation of § 2 of the Sherman Act.  (Doc. 83 ¶¶ 79-87.)  This counterclaim is premised in significant part on the lawsuit concerning the '140 patent that ThermoLife filed against HumanN in June 2016 and voluntarily dismissed in January 2018. (*Id.*)  HumanN alleges this was a "sham" lawsuit intended to "wrongfully block anyone else, including specifically HumanN, from selling N-O supplement products in the United States."  (*Id.* ¶¶ 81-82.)   Additionally, HumanN alleges that ThermoLife and Kramer engaged in other baseless patent litigation, and made threats of other baseless patent litigation, that in tandem with the 2016 lawsuit "achieved a dangerous probability of success of monopolizing the relevant market."  (*Id.* ¶¶ 83-86.)

ThermoLife moves to dismiss Counterclaim I for a variety of reasons, including that it is immune from antitrust liability under the *Noerr-Pennington* doctrine, which provides protection to patent holders who assert patent rights in good faith.  (Doc. 97 at 7-11.)  HumanN responds that, for various reasons, ThermoLife's conduct falls within the "sham" litigation exception to *Noerr-Pennington* immunity.  (Doc. 103 at 4-10.)

1.   *Noerr-Pennington* Immunity And The "Sham" Exception

Section 2 of the Sherman Act makes it unlawful for a person to "monopolize, or attempt to monopolize . . . any part of the trade or commerce among the several States." 15 U.S.C. § 2.  However, "the Supreme Court [has] held that federal antitrust laws are not violated by conduct of private parties that consists merely of attempts to solicit governmental action . . . which may have an anticompetitive effect."  *Carroll Touch, Inc. v. Electro Mech. Sys., Inc.*, 15 F.3d 1573, 1582 (Fed. Cir. 1993), *overruled on other*

grounds by *Nobelpharma AB v. Implant Innovations, Inc.*, 141 F.3d 1059, 1068 (Fed. Cir. 1998).[4]   This immunity doctrine has come to be known as *Noerr-Pennington* immunity. *See generally Kaiser Found. Health Plan, Inc. v. Abbott Labs., Inc.*, 552 F.3d 1033, 1044 (9th Cir. 2009) ("The *Noerr-Pennington* doctrine allows private citizens to exercise their First Amendment rights to petition the government without fear of antitrust liability. . . . *Noerr-Pennington* originally immunized only petitions to legislative officials, but the Supreme Court extended *Noerr-Pennington* immunity to petitions to administrative agencies and courts.").   Thus, although patent rights do not permit a patentholder to violate antitrust laws, "the antitrust laws do not negate [a] patentee's right to exclude others from patent property." *Chamberlain Grp., Inc. v. Skylink Techs., Inc.*, 381 F.3d 1178, 1201 (Fed. Cir. 2004) (alteration in original) (internal quotation marks omitted).

An important exception to *Noerr-Pennington* immunity is known as the "sham" litigation exception.   It applies when the patentee's actions constituted a "mere sham to cover what is actually nothing more than an attempt to interfere directly with the business relationships of a competitor." *E. R.R. Presidents Conf. v. Noerr Motor Freight, Inc.*, 365 U.S. 127, 144 (1961).   "Sham" litigation is a lawsuit which is (1) "objectively baseless in the sense that no reasonable litigant could realistically expect success on the merits" and (2) subjectively motivated to conceal "an attempt to interfere *directly* with the business relationships of a competitor through the use [of] the governmental *process*—as opposed to the *outcome* of that process—as an anticompetitive weapon." *Pro. Real Est. Invs., Inc. v. Columbia Pictures Indus., Inc.* (*PRE*), 508 U.S. 49, 60-61 (1993) (alteration in original) (citation and internal quotation marks omitted).

…

---

[4]      Federal Circuit law governs whether a patent holder has violated the antitrust laws by enforcing its patent, including by bringing an infringement suit. *Nobelpharma AB v. Implant Innovations, Inc.*, 141 F.3d 1059, 1068 (Fed. Cir. 1998) (holding that "whether conduct in procuring or enforcing a patent is sufficient to strip a patentee of its immunity from the antitrust laws is to be decided as a question of Federal Circuit law" and "applies equally to all antitrust claims premised on the bringing of a patent infringement suit"). Ninth Circuit law governs all other antitrust questions, such as "relevant market, market power, damages, etc., as those issues are not unique to patent law." *Id.*

1

a. *Sham Litigation—2016 Lawsuit Concerning '140 Patent*

2      The first element of the sham litigation exception turns on whether the underlying

3 lawsuit was objectively unreasonable. "If an objective litigant could conclude that the suit

4 is reasonably calculated to elicit a favorable outcome, the suit is immunized under *Noerr*,

5 and an antitrust claim premised on the sham exception must fail." *Id.* at 60. A court must

6 find the litigation to be objectively meritless before examining a litigant's subjective

7 motivation. *Id.* "If the litigation is not objectively baseless, it cannot be deemed a sham

8 regardless of the subjective intent involved in bringing the litigation." *Honeywell Int'l Inc.*

9 *v. Universal Avionics Sys. Corp.*, 488 F.3d 982, 1000 (Fed. Cir. 2007).

10      ThermoLife argues the 2016 lawsuit concerning the '140 patent was not objectively

11 baseless because it provided a claim chart. (Doc. 97 at 10.) Additionally, ThermoLife

12 emphasizes that it voluntarily dismissed the 2016 lawsuit before there was an evaluation

13 of the merits of its claims. (*Id.* at 9.)[5] Finally, ThermoLife argues the real reason it

14 voluntarily dismissed the 2016 lawsuit was the Supreme Court's decision in *TC Heartland,*

15 *LLC v. Kraft Foods Group Brands, LLC*, 137 S.Ct. 1514 (2017), which "up-ended twenty

16 years of Federal Circuit" precedent and showed that the lawsuit needed to be filed in a

17 different venue. (*Id.*)

18      These arguments are unavailing. First, HumanN has plausibly alleged that

19 ThermoLife knew, despite providing the claim chart, that HumanN did not infringe the

20 '140 patent, because the patent only covered a "method of orally administering specific

21 doses of an inorganic nitrate or inorganic nitrite with a result of improved physical

22 performance during exercise and reduced oxygen consumption" yet the enclosed materials

23 showed that Neo40 "did not reduce oxygen consumption and, in fact, increased it." (Doc.

24 83 ¶¶ 46, 49.) Indeed, HumanN alleges that it informed ThermoLife of this difference, and

25 ───────────────

26 [5] ThermoLife requests that the Court take judicial notice of the 2016 lawsuit's docket, namely the fact that the parties "jointly moved to stay the case due to the re-examination and, as a result HumanN never filed an Answer." (Doc. 97 at 8 n.15.) For the reasons discussed in Part I.A above, the Court may take judicial notice of the fact that ThermoLife and HumanN filed a joint motion to "stay all proceedings . . . pending the outcome of the [PTO's] reexamination of the patent-in-suit" in the 2016 lawsuit. *ThermoLife Int'l, LLC v. Neogenis Labs, Inc.*, 16-cv-02070, Doc. 11 at 1.

explained why Neo40 therefore could not have infringed the '140 patent, but ThermoLife sued HumanN for infringement anyway. (*Id.* ¶ 50.) Although ThermoLife attempts to proffer various facts and documents that are not mentioned in HumanN's pleading (including struck Exhibit F) to demonstrate that its infringement analysis was correct (Doc. 97 at 10 & n.18), the proffered facts and documents are not judicially noticeable and thus not properly before the Court in the context of a motion to dismiss. And even if those additional facts and documents were properly before the Court, dismissal under Rule 12(b)(6) would remain inappropriate. *IPtronics Inc. v. Avago Techs. U.S., Inc.*, 2015 WL 5029282, *8 (N.D. Cal. 2015) ("[T]his Court is ill-equipped on a motion to dismiss to evaluate the substantiality of . . . evidence of infringement . . . . Those allegations are not controverted by the judicially noticeable documents and are sufficient, when taken as true, to establish that [the patentee] could not reasonably have expected success on its patent infringement claims . . . .").

Second, and in a similar vein, the Court is not required to accept, at the motion-to-dismiss stage, ThermoLife's factual assertion that the real reason it chose to voluntarily dismiss the 2016 lawsuit was concern over venue brought about by *TC Heartland*, not concern about the substantive viability of its infringement claim. HumanN alleges that ThermoLife dismissed the action in part because ThermoLife knew its suit was meritless. (Doc. 83 ¶¶ 51-54, 82.) Accepting this allegation as true, as the Court must in the motion-to-dismiss context, HumanN's allegations concerning the objectively baseless nature of the 2016 lawsuit remain plausible.[6] *Cf. Sonus Networks, Inc. v. Inventergy, Inc.*, 2015 WL 4539814, *2 (N.D. Cal. 2015) ("[C]ourts rarely award *Noerr-Pennington* immunity at the

_____

[6] To be clear, the Court is not suggesting that the PTO's decision to initiate reexamination raises an inference that ThermoLife's initiation of the 2016 lawsuit was a sham. *Bal Seal Eng'g, Inc. v. Nelson Prods., Inc.*, 2016 WL 11518601, *7 (C.D. Cal. 2016) ("That [the patentholder] ultimately lost on its patent claims before the Patent Trial and Appeal Board cannot be used to infer that the initial complaint was objectively baseless."). Rather, HumanN's theory turns on the alleged contradiction between the '140 patent itself (which covers administrations resulting in reduced oxygen consumption) and the materials provided by ThermoLife (which suggested that Neo40 increased oxygen consumption) and on the allegation that ThermoLife chose to file suit after this alleged contradiction was brought to its attention.

1   motion to dismiss stage, where the Court must accept as true the non-moving party's well-

2   pleaded allegations.").[7]

3       The bottom line is that HumanN's allegations, taken as true, plausibly allege

4   objective baselessness—HumanN alleges that ThermoLife knew Neo40 didn't infringe the

5   '140 patent but brought an infringement lawsuit anyway.  *Move, Inc. v. Real Est. All. Ltd.*,

6   2008 WL 11338568, *2 (C.D. Cal. 2008) ("[I]f Defendants actually knew that . . . Plaintiffs

7   were not infringing [the] patents, it would be unreasonable for [the patentee] to reasonably

8   expect success on the merits.") (citation omitted).

9       As for the second prong of the sham litigation analysis, ThermoLife argues that

10  HumanN failed to "provide anything more than conclusory allegations but does not allege

11  facts that permit a plausible inference of bad faith." (Doc. 97 at 8.)  ThermoLife also argues

12  that its voluntary dismissal of the lawsuit "makes it implausible that ThermoLife filed the

13  lawsuit against HumanN" for anticompetitive purposes.  (Doc. 108 at 6.)

14      The Court disagrees.  HumanN has sufficiently alleged that ThermoLife was

15  subjectively motivated to "impose collateral, anti-competitive injury rather than to obtain

16  a justifiable legal remedy."  *Nobelpharma*, 141 F.3d at 1071.  HumanN alleges that

17  ThermoLife pursued a sub-license arrangement with HumanN as the '140 patent lawsuit

18  was ongoing and "threatened to drive HumanN out of business entirely if it [did] not" agree

19

20  _____

    [7]     In its reply, ThermoLife argues that "courts routinely apply the Noerr-Pennington
21  doctrine to dismiss claims at the pleading stage."  (Doc. 108 at 4.)  But the cases cited by
    ThermoLife are easily distinguishable.  In the first cited case, the Ninth Circuit was
22  deciding whether the sham litigation doctrine extended to the litigation discovery process.
    *Freeman v. Lasky, Haas & Cohler*, 410 F.3d 1180, 1184 (9th Cir. 2005).  The court held
23  that discovery misconduct did not render the lawsuit objectively baseless because the
    accused parties "prevailed on their defense in the district court after the discovery
24  misconduct was discovered, undone and sanctioned."  *Id.* at 1185.  The circumstances are
    different in this case: ThermoLife's suit against HumanN was never resolved on the merits,
25  let alone in ThermoLife's favor.  In the second cited case, the Federal Circuit held that the
    *Noerr-Pennington* doctrine covered a defendant's alleged activity and that the sham
26  litigation exception did not apply because the plaintiff had not "demonstrated that any of
    the alleged acts related to the . . . litigation were objectively baseless."  *Indus. Models, Inc.*
27  *v. SNF, Inc.*, 716 Fed. App'x 949, 956 (Fed. Cir. 2017).  But here, HumanN *has* plausibly
    alleged that ThermoLife's activities were objectively baseless.  *Industrial Models* is further
28  distinguishable in that the court there found the defendants had not engaged in a "pattern
    of baseless, repetitive claims."  *Id.* (citations and internal quotation marks omitted).  Here,
    in contrast, HumanN has advanced a serial litigation claim.

to the arrangement.  (Doc. 83 ¶ 42.)  "In essence, Kramer asked that HumanN pay him a license for a valueless patent, and in exchange he promised ThermoLife would stop harassing HumanN with bad-faith lawsuits."  (*Id.*)  Taken as true, such allegations support HumanN's claim that ThermoLife brought the '140 patent lawsuit in an attempt to impose a collateral, anti-competitive injury upon HumanN.  The Court acknowledges that the factual support for this prong is scant and toes the line of being conclusory, but the Court is hesitant to dismiss the counterclaim on this ground because the evidence of ThermoLife's intent in bringing suit is most likely in ThermoLife's hands.  *Cf. Ernest W. Hahn, Inc. v. Codding*, 615 F.2d 830, 835 (9th Cir. 1980) (cautioning against pre-trial dismissal of antitrust claims because the evidence lies "largely in the hands of the defendants").

Accordingly, accepting HumanN's well-pled allegations as true and viewing them in a light most favorable to HumanN, ThermoLife and Kramer are not entitled to dismissal of Counterclaim I based on the inapplicability of the sham litigation exception to the *Noerr-Pennington* doctrine.  *EcoDisc Tech. AG v. DVD Format/Logo Licensing Corp.*, 711 F. Supp. 2d 1074, 1083 (C.D. Cal. 2010) ("At [the motion to dismiss] stage in the litigation, the Court need not conclude whether [the plaintiff's] conduct was a sham.  It must decide only whether Plaintiff has properly pleaded that the conduct was a sham . . . .").

b.   *Serial Sham Litigation*

HumanN also alleges that ThermoLife has engaged in a pattern of filing objectively baseless lawsuits.  (Doc. 83 ¶¶ 33-35; Doc. 103 at 8-10.)  In its motion to dismiss, ThermoLife does not address whether these allegations, taken as true, fall within an exception to *Noerr-Pennington* immunity—it simply contends they should be struck due to their "salacious and false" nature.  (Doc. 97 at 2-4.)  HumanN responds that the allegations are sufficient to deprive ThermoLife of *Noerr-Pennington* immunity under the Supreme Court's decision in *California Motor Transport Co. v. Trucking Unlimited*, 404 U.S. 508 (1972).  (Doc. 103 at 5-6, 8-10.)  In reply, ThermoLife argues that *California Motor* is inapplicable because "there is not a series of litigations by ThermoLife asserting

the '140 Patent." (Doc. 108 at 5 & n.9.)  ThermoLife also argues that, even if *California Motor* were applicable, "HumanN has not alleged any facts that demonstrate that ThermoLife monopolized or attempted to monopolize the relevant market."   (*Id.*) ThermoLife does not argue that HumanN's allegations are otherwise insufficient.

In *California Motor*, a group of highway carriers was charged with violating antitrust laws via a "concerted action . . . to institute state and federal proceedings to resist and defeat applications . . . to acquire operating rights."  404 U.S. at 509.  The Supreme Court concluded these allegations were sufficient to come within the sham litigation exception to *Noerr-Pennington* immunity.  *Id.* at 516.  Although ThermoLife argues that *California Motor* is inapplicable, ThermoLife does not point to any legal authority that limits serial litigation claims under *California Motor* to litigation arising out of the same patent.  (Doc. 108 at 5 & n.9.)  The Court declines to rule on this argument, which ThermoLife raised for the first time in a reply and which has not been fully briefed by the parties.

ThermoLife's argument that HumanN "has not alleged any facts that demonstrate that ThermoLife monopolized or attempted to monopolize the relevant market" (*id.*) similarly lacks merit.   Pleading the sham litigation exception to *Noerr-Pennington* immunity does not establish an antitrust claim—an antitrust plaintiff must also allege a substantive antitrust violation.  *PRE*, 508 U.S. at 61 ("Proof of a sham merely deprives the defendant of immunity; it does not relieve the plaintiff of the obligation to establish all other elements of his [antitrust] claim."); *Smarte Carte, Inc. v. Innovative Vending Sols. LLC*, 2020 WL 5758363, *3 (D.N.J. 2020) ("Even if . . . a party defeats the other party's *Noerr-Pennington* immunity by demonstrating both the objective and the subjective components of a sham litigation, that party must still prove a substantive antitrust violation.").  To the extent ThermoLife makes this argument to show that HumanN has not sufficiently alleged a substantive antitrust claim, the Court addresses that issue below.[8]

_____

[8]      In its response, HumanN sets out standards for various sham litigation allegations in the Ninth Circuit and arguments for the sufficiency of its allegations under those standards.  (Doc. 103 at 5-6, 8-10.)  Because ThermoLife does not challenge the adequacy

### c.      *Sham Out-Of-Court Communications*

ThermoLife argues that its conduct outside of litigation, such as sending a demand letter to HumanN, is not actionable under the antitrust laws.  (Doc. 97 at 8.)  ThermoLife cites only one case as support for this claim: *Oetiker v. Jurid Werke GmbH*, 671 F.2d 596 (D.C. Cir. 1982).  HumanN argues that ThermoLife's position on this point "is simply false" and cites an array of cases, including cases from the Ninth and Federal Circuits, recognizing that threats of litigation are potentially actionable.  (Doc. 103 at 8 n.5.)

HumanN has the better side of this argument.  This Court must follow the law of the Ninth and Federal Circuits, not the law of the D.C. Circuit, when addressing antitrust liability and immunity premised on the bringing of a patent infringement suit. *Nobelpharma*, 141 F.3d at 1068.  The Ninth and Federal Circuits have recognized (or, at a minimum, strongly suggested) that antitrust liability may be premised on "sham" threats of litigation.  *Globetrotter Software, Inc. v. Elan Comput. Grp., Inc.*, 362 F.3d 1367, 1376-77 (Fed. Cir. 2004) (discussing how *Noerr-Pennington* immunity and the sham exception apply "to pre-litigation communications" and recognizing that "[a] plaintiff claiming that a patent holder has engaged in wrongful conduct by asserting claims of patent infringement [via such communications] must establish that the claims of infringement were objectively baseless"); *Cornucopia Prods., LLC v. Dyson, Inc.*, 881 F. Supp. 2d 1086, 1102 (D. Ariz. 2012) (recognizing that "'sham' threats of litigation against the market competitor can constitute a potential antitrust violation").  *See also Sosa v. DIRECTV, Inc.*, 437 F.3d 923, 938 (9th Cir. 2006) ("Finding that the protections of the Petition Clause extend to prelitigation settlement demands as a class does not mean that such demands are absolutely protected from liability. . . .  *Noerr-Pennington* immunity is not a shield for petitioning conduct that, although ostensibly directed toward influencing governmental action, is a mere sham to cover what is actually nothing more than an attempt to interfere directly with the business relationships of a competitor.") (internal quotation marks omitted).

…

---

of HumanN's allegations on these points, the Court need not address these arguments.

- 15 -

1

## 2. Attempted Monopolization

For the reasons discussed above, HumanN has adequately pleaded that ThermoLife engaged in sham litigation and sham out-of-court communications.  Such showings, however, merely negate ThermoLife's claimed entitlement to *Noerr-Pennington* immunity and do "not relieve the plaintiff of the obligation to establish all other elements of his [antitrust] claim."  *PRE*, 508 U.S. at 61.

ThermoLife asserts that HumanN's attempted monopolization claim fails because HumanN has not sufficiently or correctly defined the relevant market.  (Doc. 97 at 11; Doc. 108 at 7.)  Specifically, ThermoLife argues that HumanN failed to allege a lack of substitutes[9] "to the technology that ThermoLife offers."  (*Id.*)  ThermoLife also contends that HumanN's proffered definition is "so narrow[] that it artificially limits the players in the market to just a few."  (Doc. 108 at 7.)  HumanN responds that it did allege a relevant market: the "N-O supplementation product market in the United States."  (Doc. 103 at 13, citing Doc. 83 ¶ 86.)  As for the availability of substitutes, HumanN argues that "ThermoLife's patents are largely valueless . . . so of course there are 'substitutes' for its 'technology.'"  (*Id.*)

"[T]o state a valid claim under the Sherman Act, a plaintiff must allege that the defendant has market power within a 'relevant market.'  That is, the plaintiff must allege both that a 'relevant market' exists and that the defendant has power within that market."  *Newcal Indus., Inc. v. Ikon Off. Sol.*, 513 F.3d 1038, 1044 (9th Cir. 2008).  These requirements apply to attempted monopolization claims.  *Id.* at 1044 n.3.  The Ninth Circuit has further elaborated that:

> There is no requirement that these elements of the antitrust claim be pled with specificity.  An antitrust complaint . . . survives a Rule 12(b)(6) motion unless it is apparent from the face of the complaint that the alleged market suffers a fatal legal defect.  And since the validity of the "relevant market" is

---

[9]     ThermoLife asks the Court to take judicial notice "that there are thousands of dietary supplements that do not include either ThermoLife's or HumanN's ingredients or technology."  (Doc. 97 at 11.)  ThermoLife does not, however, provide any support for this proposition or any explanation as to why the Court would be able to take judicial notice of such a fact.  (*Id.*)  Accordingly, the Court declines to take judicial notice.

1

2

> typically a factual element rather than a legal element, alleged markets may
> survive scrutiny under Rule 12(b)(6) subject to factual testing by summary
> judgment or trial.

3

*Id.* at 1045 (citations omitted).

4

Put another way, an antitrust complaint is not subject to dismissal at the Rule

5

12(b)(6) stage based on the inadequacy of its market definition unless the definition is

6

"facially unsustainable."  *Id.*  To be facially sustainable, the allegations must set out the

7

relevant product and geographic markets.  *Id.* at 1045 & n.4.  Additionally, the product

8

"market must encompass the product at issue as well as all economic substitutes for the

9

product." *Id.* at 1045.  This includes "the group or groups of sellers or producers who have

10

actual or potential ability to deprive each other of significant levels of business."  *Id.*

11

(internal quotation marks omitted).  "The product market includes the pool of goods or

12

services that enjoy reasonable interchangeability of use and cross-elasticity of demand."

13

*Oltz v. St. Peter's Cmty. Hosp.*, 861 F.2d 1440, 1446 (9th Cir. 1988).

14

Here, as noted, HumanN alleges that the relevant market is "N-O supplement

15

products in the United States" or "the market of N-O supplementation technology and

16

products."  (Doc. 83 ¶¶ 81, 84, 86.)  In other words, HumanN has identified the product

17

market as N-O supplementation products and the geographic market as the United States.

18

The Court agrees with ThermoLife that these allegations, standing alone, are insufficient.

19

HumanN does not allege, among other things, what the N-O supplementation market is,

20

what general products it includes, whether the N-O supplementation market is a general

21

market or a sub-market of the broader dietary supplement market, and whether different

22

supplement products are reasonably interchangeable for the same use as N-O supplement

23

products.

24

HumanN *argues* in its response to the motion to dismiss that the existence or lack

25

of substitutes is irrelevant (Doc. 103 at 13), but HumanN's failure to *plead* such allegations

26

warrants dismissal: "Because a relevant market includes all products which are reasonably

27

interchangeable, [p]laintiff's failure to define its market by reference to the rule of

28

reasonable interchangeability is, standing alone, valid grounds for dismissal."   *B.V.*

*Optische Industrie De Oude Delft v. Hologic, Inc.*, 909 F. Supp. 162, 171-72 (S.D.N.Y. 1995) (alteration in original) (citation and internal quotation marks omitted).  *See also Hicks v. PGA Tour, Inc.*, 897 F.3d 1109, 1123 (9th Cir. 2018) ("[T]he district court properly concluded that the . . . product markets are facially unsustainable because they fail to include many reasonabl[y] interchangeab[le] products.") (alterations in original) (internal quotation marks omitted); *Staley v. Gilead Scis., Inc.*, 446 F. Supp. 3d 578, 617 (N.D. Cal. 2020) (dismissing antitrust claims based on cART drug market because it was not clear "what exactly the cART product market" was and because plaintiff had not explained "how there is reasonable interchangeability of use with respect to different cART drugs"); *In re ATM Antitrust Litig.*, 768 F. Supp. 2d 984, 995 (N.D. Cal. 2009) ("The fact that multiple products may do the same thing does not mean they are 'reasonably interchangeable' to the consumer.").  However, HumanN will be granted leave to amend because it may be possible to cure the market definition deficiency.

Finally, ThermoLife also contends that HumanN has failed to establish a different essential element of an attempted monopolization claim—that ThermoLife had "a dangerous probability of achieving monopoly power."  *SmileCare Dental Grp. v. Delta Dental Plan*, 88 F.3d 780, 783 (9th Cir. 1996).  Specifically, ThermoLife argues that HumanN's allegations on this point are deficient because (1) HumanN has not alleged ThermoLife's market share and (2) "[t]here are too many competitors in this market" to make monopolization possible.  (Doc. 97 at 11-12.)  In response, HumanN argues (1) it is unnecessary for an antitrust complaint to allege an exact, percentage-based market share, (2) the existence of a dangerous probability of monopolization can be inferred from predatory conduct, and (3) ThermoLife has made "qualitative allegations of market power" in its own pleadings and press releases.  (Doc. 103 at 14-15.)  In reply, ThermoLife doesn't respond to most of HumanN's arguments (or any of HumanN's cited cases) and merely argues that, because HumanN's proposed market definition is flawed, it follows that HumanN's dangerous-probability-of-monopolization allegations are flawed, too.  (Doc. 108 at 7.)

ThermoLife is not entitled to dismissal on this basis.  ThermoLife affirmatively alleges in its complaint that it "is a world leader in the use and development of nitrate technology in dietary supplements" and that its "patented technology and ingredients are included in some of the world's top-selling pre-workout supplements."  (Doc. 68 ¶¶ 1, 44.)  HumanN incorporates these allegations by reference in its pleading and relies on them to allege that, "[t]hrough the anticompetitive and exclusionary acts described above, Kramer and ThermoLife achieved a dangerous probability of success of monopolizing the relevant market."  (Doc. 83 ¶¶ 38, 79, 86.)  Such allegations are sufficient to allege a dangerous probability of achieving monopoly power.  *Cf. Scooter Store, Inc. v. SpinLife.com, LLC*, 777 F. Supp. 2d 1102, 1117-18 (S.D. Ohio 2011) (denying TSS's motion to dismiss, which challenged the adequacy of the dangerous-probability-of-monopolization allegations, because "the plaintiff does not have to allege an exact, percentage-based market share" and "[b]y its own admission, TSS sells more power mobility equipment to mobility impaired persons than any of its competitors . . . [so the] Court can infer that if TSS is successful, it would have the power to drive its competitors from the marketplace or reduce their market share").

D.  **Counterclaim II**

Counterclaim II is a claim for false advertising in violation of the Lanham Act.  This claim is based, in significant part, on a press release that Kramer issued in September 2018, which was entitled "ThermoLife Serves HumanN A Beet Down For Selling Falsely Advertised And Misbranded Products Including SuperBeets, BeetElite, And Neo40."  (Doc. 104-1 at 2.)  The press release disclosed that ThermoLife had filed this action and described ThermoLife's basis for doing so.  (*Id.* at 2-5.)  HumanN alleges this press release constituted "commercial speech published to a national audience" and violated the Lanham Act because it "falsely and misleadingly disparaged both HumanN and the quality of HumanN's products," causing HumanN to suffer injury.  (Doc. 83 ¶¶ 88-97.)

The Lanham Act prohibits using a "false or misleading description of fact, or false or misleading representation of fact" in "commercial advertising," if the statements

1    "misrepresent[] the nature, characteristics, qualities, or geographic origin of . . . another

2    person's goods, services, or commercial activities."  15 U.S.C. § 1125(a)(1)(B).   The

3    Lanham Act grants a private right of action to one "who believes that he or she is or is

4    likely to be damaged by" the false advertising.  *Id.* § 1125(a)(1).

5        In the Ninth Circuit, "[t]he elements of a Lanham Act . . . false advertising claim

6    are: (1) a false statement of fact by the defendant in a commercial advertisement about its

7    own or another's product; (2) the statement actually deceived or has the tendency to deceive

8    a substantial segment of its audience; (3) the deception is material, in that it is likely to

9    influence the purchasing decision; (4) the defendant caused its false statement to enter

10   interstate commerce; and (5) the plaintiff has been or is likely to be injured as a result of

11   the false statement, either by direct diversion of sales from itself to defendant or by a

12   lessening of the goodwill associated with its products."  *Southland Sod Farms v. Stover*

13   *Seed Co.*, 108 F.3d 1134, 1139 (9th Cir. 1997).

14       ThermoLife argues that HumanN has failed to satisfy the first element of this test—

15   the existence of a "false statement of fact."  (Doc. 97 at 13-14.)  ThermoLife argues that

16   because the press release simply repeated the allegations contained in its complaint in this

17   action, while prefacing each set of allegations with the phrase "has alleged," the press

18   release was truthful.  (*Id.*)  In response, HumanN argues that ThermoLife is not entitled to

19   dismissal because the press release "does not merely report on [the] initial Complaint" and

20   instead "asserts false and derogatory statements as facts, and even 'quotes' Kramer at

21   length."  (Doc. 103 at 12.)  As for Kramer's quote, ThermoLife replies that it was a non-

22   actionable opinion statement. (Doc. 108 at 10.)

23       ThermoLife is not entitled to dismissal on this basis.  The headline of the press

24   release, which is not qualified with the phrase "as alleged," affirmatively states that

25   HumanN "sell[s] falsely advertised and misbranded products."   (Doc. 104-1 at 2.)

26   Resolving all reasonable inferences in favor of the non-movant, this is a statement of fact.

27   Additionally, the quotation from Kramer includes an assertion that "HumanN relies on

28   false representation after false representation to deceive consumers into purchasing

1    HumanN's products." (*Id.* at 5.)  Again, resolving all reasonable inferences in favor of the
2    non-movant, this is a statement of fact rather than a statement of opinion.

3        ThermoLife also argues that, because the press release "informs the public about the
4    contents of [its] Complaint" and about its "patent rights," it is protected by both Arizona's
5    state-law litigation privilege and *Noerr-Pennington* immunity.   (Doc. 97 at 14-15.)
6    HumanN responds that state-law litigation privileges (HumanN calls this "qualified
7    immunity") do not apply to federal claims.  (Doc. 103 at 12.)  ThermoLife does not respond
8    to this argument in its reply.

9        Arizona's state-law litigation privilege does not bar HumanN's Lanham Act claim.
10   *See, e.g., Troyer v. Shrider*, 2008 WL 4291450, *3 (C.D. Cal. 2008) ("State law . . . does
11   not supply the rule of decision [under Rule 501] with respect to . . . [the] cause of action
12   for violation of the Lanham Act," so "the court must apply federal privilege law as to that
13   claim.").  *Cf. Martinez v. California*, 444 U.S. 277, 284 (1980) ("It is clear that the
14   California immunity statute does not control this [42 U.S.C. § 1983] claim . . . ."); *Pardi v.
15   Kaiser Found. Hosps.*, 389 F.3d 840, 851 (9th Cir. 2004) ("[A] state absolute litigation
16   privilege purporting to confer immunity from suit cannot defeat a federal cause of action.")
17   (alteration in original) (internal quotation marks omitted).  ThermoLife does not point to
18   any decision holding otherwise.

19       Finally, the press release is not protected under *Noerr-Pennington*.   The press
20   release accuses HumanN of falsely marking HumanN's products with patents the products
21   do not practice.  (Doc. 104-1 at 2-5.)  The only instance in which the press release mentions
22   ThermoLife's patents is in Kramer's quote: "ThermoLife holds the patents for the
23   technology in HumanN's products, not HumanN."  (*Id.* at 5.)  Yet even this statement
24   seems to relate to ThermoLife's earlier contention that "contrary to HumanN's *false
25   advertising*, none of [the] patents that HumanN licenses and *falsely marks* on its products
26   protect 'patented Nitric Oxide technology.'"  (*Id.* at 4, emphases added.)  ThermoLife
27   cannot claim it is asserting its patent rights in a press release about a lawsuit that has
28   nothing to do with enforcement of its patents.

1    Because ThermoLife does not seek dismissal of HumanN's Lanham Act claim on

2    any other basis, dismissal is not warranted.

3          E.      **Counterclaims III And VI**

4          In Counterclaims III and VI, HumanN asserts state-law claims for unfair

5    competition and trade libel premised on the same underlying factual allegations as its

6    Lanham Act claim.  (Doc. 83 ¶¶ 100-04, 122-26.)  The parties do not dispute that the

7    Lanham Act analysis above applies similarly to the unfair competition and trade libel

8    claims.  (Doc. 97 at 13-15; Doc. 103 at 16-17.)  *See also Walker & Zanger, Inc. v. Paragon*

9    *Indus., Inc.*, 549 F. Supp. 2d 1168, 1182 (N.D. Cal. 2007) ("In the Ninth Circuit, claims of

10   unfair competition and false advertising under . . . common law are 'substantially

11   congruent' to claims made under the Lanham Act.").  Although ThermoLife does not make

12   any additional arguments for dismissal of the unfair competition and trade libel claims, the

13   Court must address ThermoLife's argument concerning Arizona's litigation privilege

14   because Counterclaims III and VI are not federal claims.

15         ThermoLife identifies *Green Acres Trust v. London*, 688 P.2d 617 (Ariz. 1984), as

16   the key case supporting its privilege claim.  In *Green Acres*, a group of lawyers was sued

17   for defamation after making statements in a press conference "preliminary" to their

18   initiation of a class action lawsuit.  *Id.* at 619.  The court analyzed the bounds of the

19   absolute litigation privilege and the qualified litigation privilege.  *Id.* at 620.

20         Because ThermoLife does not argue its press release was protected by the absolute

21   privilege, the Court will only address the qualified privilege.  ThermoLife's invocation of

22   that form of privilege fails, at least based on the very limited briefing provided in its moving

23   papers.   In *Green Acres*, the court rejected the attorneys' qualified privilege claim,

24   concluding they could not invoke the common-law privilege governing "Reports of Public

25   Proceedings" because they had made the challenged statements before filing the lawsuit

26   they were purporting to summarize.  *Id.* at 627 ("Obviously, there could not be a report of

27   an official or public proceeding absent the existence of that proceeding.").  Additionally,

28   and most relevant here, the court clarified that although the general rule is that "[a]nyone

may describe what transpired at a public proceeding so long as the publisher provides a fair and accurate rendition . . . [o]ne exception to this wide application is the speaker who by design uses the privilege to republish defamation he previously made during the public proceeding." *Id.* at 626.  After all, "[t]he privilege does not sanction self-serving re-publication." *Id.*  That, of course, is the scenario presented here—ThermoLife and Kramer filed a lawsuit accusing HumanN of various forms of misconduct, then issued a press release repeating those allegations (as well as making additional allegations).  ThermoLife has not identified any Arizona case ever applying the qualified litigation privilege under these circumstances.

Finally, *Green Acres* also recognized that even when a "privileged occasion" arises, a speaker can forfeit its entitlement to the qualified privilege via "abuse of that privilege," such as by "excessive publication . . . to an unprivileged recipient not reasonably necessary to protect the interest upon which the privilege is grounded." *Id.* at 624.  Critically, "whether the occasion for the privilege was abused is a question of fact for the jury." *Id.*  These principles further undermine ThermoLife's and Kramer's attempt to resolve their claimed entitlement to the qualified litigation privilege at the motion-to-dismiss stage—resolving all reasonable inferences in HumanN's favor, the issuance of this press release was abusive, excessive, and not necessary to keep the public informed about public proceedings.

F.     **Counterclaim IV**

In Counterclaim IV, HumanN asserts a state-law claim for civil extortion.  (Doc. 83 ¶¶ 105-11.)  This claim is premised on ThermoLife's and Kramer's attempts to persuade HumanN to enter into a sub-license agreement (and threats to sue in the absence of an agreement), the 2016 lawsuit over the '140 patent, and ThermoLife's and Kramer's later threats to destroy HumanN's business.  (*Id.*)  ThermoLife moves to dismiss this claim because (1) Arizona does not recognize a claim for civil extortion and (2) ThermoLife's conduct does not rise to the level of extortion.  (Doc. 97 at 12-13.)  HumanN disagrees. (Doc. 103 at 16-17.)

Although Arizona law is not a model of clarity on this issue, the Court concludes that ThermoLife has the better side of this argument.  "In determining the law of the state for purposes of diversity, a federal court is bound by the decisions of the highest state court.  If the state's highest court has not decided an issue, it is the responsibility of the federal courts sitting in diversity to predict how the state high court would resolve it."  *Albano v. Shea Homes Ltd. P'ship*, 634 F.3d 524, 530 (9th Cir. 2011) (citation and internal quotation marks omitted).  Here, the Court's best prediction is that the Arizona Supreme Court would decline to recognize a claim for civil extortion, at least under the circumstances of this case.

The sole case that HumanN cites in support of its view that Arizona recognizes a claim for civil extortion is *Strojnik v. Edalat*, 2008 WL 11338791 (D. Ariz. 2008).  But there, the court did not conduct any independent analysis concerning whether the Arizona courts would recognize such a claim—instead, it simply accepted the parties' stipulation that "the applicable law in support of Plaintiff's claim of extortion" was Arizona's criminal extortion statute.  *Id.* at *2.

This Court has significant doubt that the Arizona courts would, in fact, follow this approach.  In Arizona, "[t]he general rule is that no private cause of action should be inferred based on a criminal statute where there is no indication whatsoever that the legislature intended to protect any special group by creating a private cause of action by a member of that group."  *Phx. Baptist Hosp. & Med. Ctr., Inc. v. Aiken*, 877 P.2d 1345, 1350 (Ariz. Ct. App. 1994) (internal quotation marks omitted).  Thus, other courts in this District have suggested that Arizona courts would not recognize a claim for civil extortion.  *Maguire v. Coltrell*, 2015 WL 470204, *3 (D. Ariz. 2015) ("Although not raised by Plaintiff, the Court . . . seriously doubts that the criminal statute relied on by Defendants, A.R.S. § 13–1804(6), gives rise to a civil cause of action . . . [because] Section 13–1804(6) contains no indication that the legislature had such intent.").

For these reasons, the Court will dismiss HumanN's civil extortion counterclaim.  Because amendment would not cure the deficiency, the Court will not grant HumanN leave to amend as to this counterclaim.  *Doe v. United States*, 58 F.3d 494, 497 (9th Cir. 1995)

("[A] district court should grant leave to amend even if no request to amend the pleading was made, unless it determines that the pleading could not possibly be cured by the allegation of other facts.") (internal quotation marks omitted).

### G.     Counterclaim V

Counterclaim V is a state-law claim for tortious interference with business expectancy, premised on allegations that ThermoLife and Kramer disrupted HumanN's "valid contractual relationship and business expectancy" with Amazon by falsely telling Amazon in March 2019 "that at least three of HumanN's listings on Amazon's site . . . infringed on one of the patents purportedly licensed by ThermoLife," which resulted in Amazon removing the listings for nearly a month.   (Doc. 83 ¶¶ 68-73, 112-21.) ThermoLife argues that dismissal is appropriate because HumanN has not alleged that ThermoLife acted in bad faith and, thus, federal law preempts the claim.  (Doc. 97 at 13.)

State-law tortious interference claims are sometimes preempted by federal patent law.  The Federal Circuit has held that federal patent law preempts state tort law where the state tort is based on "conduct that is protected or governed by federal patent law."  *Hunter Douglas, Inc. v. Harmonic Design, Inc.*, 153 F.3d 1318, 1335 (Fed. Cir. 1998), *overruled on other grounds by Midwest Indus., Inc. v. Karayan Trailers, Inc.*, 175 F.3d 1356, 1358-59 (Fed. Cir. 1999).[10]  "[I]n a case involving a patentholder's conduct in . . . publicizing its patent, if the plaintiff were to fail to allege that the defendant patentholder was guilty of . . . bad faith in the publication of a patent, then the complaint would be dismissed" on preemption grounds.  *Id.* at 1336.  Similarly, federal patent law "preempt[s] state laws that impose tort liability for a patentholder's good faith conduct in communications asserting infringement of its patent and warning about potential litigation."  *Globetrotter Software*, 362 F.3d at 1377.  Thus, "patentees do not violate the rules of fair competition by making accurate representations, and are allowed to make representations that turn out to be

---

[10]     Federal Circuit law governs this question.  *See, e.g.*, *Midwest Indus., Inc. v. Karavan Trailers, Inc.*, 175 F.3d 1356, 1358-59 (Fed. Cir. 1999) (holding that Federal Circuit law governs "questions involving the relationship between patent law and other federal and state law rights"), *abrogated on other grounds as recognized in Amgen Inc. v. Sandoz Inc.*, 877 F.3d 1315, 1325-26 (Fed. Cir. 2017).

- 25 -

1    inaccurate provided they make them in good faith." *Golan v. Pingel Enter., Inc.*, 310 F.3d

2    1360, 1371 (Fed. Cir. 2002). *See also Zenith Elecs. Corp. v. Exzec, Inc.*, 182 F.3d 1340,

3    1355 (Fed. Cir. 1999) ("[B]ad faith is a prerequisite to [a] state-law tortious interference

4    claim; without it, the claim is preempted by federal law.").

5         In sum, to survive a motion to dismiss, HumanN must allege that ThermoLife and

6    Kramer acted in bad faith when notifying Amazon in March 2019 that some of HumanN's

7    products infringed ThermoLife's '531 patent.   HumanN has not done so.   Although

8    HumanN emphasizes that there "has never been a judicial determination that any of

9    HumanN's products infringe" the '531 patent (Doc. 83 ¶¶ 70, 117), HumanN has not

10   identified any authority suggesting that a judicial determination of infringement is a

11   prerequisite to notifying a potential infringer (or a third party) of infringement.   To the

12   contrary, the Federal Circuit has stated that the "privileged right of a patentee to notify the

13   public of its patent rights is statutorily rooted in the patent laws at 35 U.S.C. § 287, which

14   authorizes patentholders to 'give notice to the public' of a patent" and makes "specific

15   notice to the *accused infringer* a prerequisite to the recovery of damages." *Zenith*, 182

16   F.3d at 1353 (emphasis added).   Thus, at most, HumanN's current allegations show that

17   the March 2019 report to Amazon was inaccurate.   But making an inaccurate allegation

18   isn't the same thing as making an inaccurate allegation in bad faith. *Golan*, 310 F.3d at

19   1371 ("[P]atentees . . . are allowed to make representations that turn out to be inaccurate

20   provided they make them in good faith.").

21        Finally, HumanN's allegations concerning the March 2019 report to Amazon are

22   much different from its allegations concerning the 2016 lawsuit (which, as discussed

23   above, are sufficient to fit within the sham litigation exception).   As for the 2016 lawsuit,

24   HumanN has alleged specific facts suggesting that ThermoLife was aware Neo40 didn't

25   infringe the '140 patent yet chose to file suit anyway.   In contrast, HumanN has not

26   provided any comparable allegations concerning the March 2019 report to Amazon, which

27   involved different patents. (Doc. 83 ¶¶ 69-71.)

28        Because HumanN has not properly alleged that ThermoLife and Kramer acted in

bad faith when making the challenged report to Amazon, the Court grants ThermoLife's motion to dismiss as to Counterclaim V.  HumanN will be granted leave to amend this counterclaim because an amendment could cure the deficiency.

H.    **Counterclaim VII**

HumanN's final counterclaim, Counterclaim VII, arises under the Arizona's Patent Troll Prevention Act ("PTPA"), A.R.S. § 44-1421 *et seq.*    (Doc. 83 ¶¶ 127-35.) ThermoLife seeks dismissal of this counterclaim on the grounds that (1) its conduct is exempted from liability under the PTPA, (2) HumanN has not alleged any conduct that would violate the PTPA, and (3) the PTPA is preempted by federal law.  (Doc. 97 at 15-16 & n.20.)

The PTPA prohibits "an assertion of patent infringement in bad faith." A.R.S. § 44-1422(A).  The statute provides separate nonexclusive lists of factors that courts may consider as evidence of bad faith or good faith. *Id.* §§ 44-1422(A), (B). Unless an assertion of patent infringement is made in bad faith, the PTPA "may not be construed to deem it an unfair or a deceptive trade practice" for a patent holder to, among other things, "[n]otify another of the infringement of that patent." *Id.* § 44-1422(C)(3).  An "assertion of patent infringement" is statutorily defined as:

(a)    Sending or delivering a demand to a target.

(b)    Threatening a target with litigation and asserting or alleging that the target has engaged in patent infringement.

(c)    Sending or delivering a demand to the customers of a target.

(d)    Making assertions or allegations, other than those made in litigation against a target, that a target has engaged in patent infringement or that a target should obtain a license to a patent in order to avoid litigation.

*Id.* § 44-1421(1).  The statute expressly exempts civil actions "that include[] a demand or assertion of patent infringement." *Id.* § 44-1424.

ThermoLife first argues that, if HumanN's basis for the PTPA claim is the alleged sham litigation concerning the '140 patent, the claim fails because the PTPA expressly exempts patent infringement litigation.  (Doc. 97 at 15.)  In response, HumanN clarifies

that its PTPA claim is based on allegations that ThermoLife "threaten[ed] HumanN with sham litigation, even after [ThermoLife] dismissed its sham infringement suit." (Doc. 103 at 18.)  Thus, ThermoLife's first dismissal argument is unavailing.[11]

ThermoLife next argues that HumanN has failed to point to any infringement-related communications that would constitute evidence of bad faith under the PTPA. (Doc. 97 at 16.)  ThermoLife emphasizes that the challenged communications contained "a detailed infringement analysis" and that there is "no dispute" that it provided the information set out in A.R.S. § 44-1422(A)(1) (*i.e.*, the patent number, contact information of the patent owner or assignee, infringement facts, and an explanation of standing). (Doc. 97 at 16.)  HumanN does not appear to dispute either of these arguments but states that "weighing the evidence has no bearing on a motion to dismiss" and argues that its factual allegations are enough to state a claim of bad faith. (Doc. 103 at 17.)

HumanN has adequately stated a claim of bad faith under the PTPA.[12]  HumanN alleges that ThermoLife's infringement analysis was unsupported, contradictory, and without merit. (Doc. 83 ¶¶ 45-49.).  Such allegations, taken as true, could support a claim for bad faith.  A.R.S. § 44-1422(A)(3), (5)-(6).  HumanN also alleges that, after ThermoLife dismissed its infringement suit, ThermoLife "insisted" that HumanN grant a $1 per unit licensing fee and pay $1 million in "back damages" within 10 days. (Doc. 83 ¶ 63.)  Such allegations, taken as true, could further support a claim for bad faith.  A.R.S. § 44-1422(A)(4).  Nor is ThermoLife correct that meeting the requirements of § 44-1422(A)(1) is automatically sufficient to defeat a PTPA claim. (Doc. 108 at 11.)  The statute makes clear that the factors are "nonexclusive"—a court may consider "[a]ny other factor that the court determines to be relevant."  A.R.S. § 44-1422(A), (A)(8).  Thus, the existence of evidence of both good and bad faith is not dispositive at the motion-to-dismiss

---

[11]    The Court need not address ThermoLife's argument that HumanN's allegation that "ThermoLife does not practice its patents" is "wholly unsupported." (Doc. 97 at 15 n.19.) Liability under the PTPA does not turn on whether the defendant actually practiced a patent.  *Cf.* A.R.S. § 44-1421(4) (defining "person").

[12]    The parties do not dispute that ThermoLife met all other requirements of the statute (*i.e.*, that ThermoLife is a "person" who made "an assertion of patent infringement"). A.R.S. § 44-1422(A).

- 28 -

stage.

ThermoLife's last argument, confined to a footnote, is that the PTPA is preempted by federal law.  (Doc. 97 at 16 n.20.)  HumanN argues in response (similarly, in a footnote) that (1) ThermoLife miscited cases and (2) ThermoLife failed to give the required notice to Arizona's Attorney General that it is challenging a state statute's constitutionality.  (Doc. 103 at 17 n.9.)  ThermoLife does not address these arguments in its reply.  (Doc. 108 at 11.)

Under Rule 5.1(a) of the Federal Rules of Civil Procedure, "[a] party that files a pleading, written motion, or other paper drawing into question the constitutionality of a . . . state statute must promptly: (1) file a notice of constitutional question stating the question and identifying the paper that raises it, if . . . a state statute is questioned and the parties do not include the state, one of its agencies, or one of its officers or employees in an official capacity; and (2) serve the notice and paper . . . on the state attorney general if a state statute is questioned."  The law is unsettled as to whether Rule 5.1's notice requirement applies when, as here, a litigant raises a preemption challenge to a state statute. Some district courts in the Ninth Circuit have concluded that a preemption challenge doesn't trigger Rule 5.1's notice requirement.  *See, e.g., Skau v. JBS Carriers, Inc.*, 2019 WL 4597516, *1 (W.D. Wash. 2019).  Those courts have relied on language from earlier Ninth Circuit decisions suggesting that "preemption is not a constitutional issue."  *Hotel Emps. & Rest. Emps. Int'l Union v. Nev. Gaming Comm'n*, 984 F.2d 1507, 1512 (9th Cir. 1993).  Other district courts in the Ninth Circuit have reached the opposite conclusion, reasoning that preemption challenges are constitutional in nature, and notice under Rule 5.1 is therefore required, because "[t]o find a state law preempted by federal law is to apply the Supremacy Clause of the United States Constitution to invalidate the state law.  A preempted law is thus unconstitutional, at least in the circumstances where it is preempted."  *Douglas v. ReconTrust Co., N.A.*, 2012 WL 5470360, *4 (W.D. Wash. 2012) (citation omitted).  *Accord Roe v. LexisNexis Risk Solutions Inc.*, 2013 WL 11246904, *1 (C.D. Cal. 2013) ("Defendant argues that . . . Plaintiff's UCL claims must fail because they are

preempted.  Because the motion calls into question the constitutionality of . . . the UCL, as applied, the Court declined to rule on Defendant's motion until it complied with Federal Rule of Civil Procedure 5.1.").  And courts outside the Ninth Circuit have suggested that notice under Rule 5.1 would be required in a case raising a facial preemption challenge but not an as-applied challenge.  *United States v. Zadeh*, 820 F.3d 746, 752-55 (5th Cir. 2016).

In the Court's view, and in the absence of concrete guidance from the Ninth Circuit, Rule 5.1 should be interpreted as requiring notice in this circumstance.  The plain language of Rule 5.1 requires notice when a litigant "draw[s] into question the constitutionality of" a state statute.  And as recent Supreme Court decisions seem to recognize, preemption claims are properly characterized as constitutional in nature.  *See, e.g., Crosby v. Nat'l Foreign Trade Council*, 530 U.S. 363, 388 (2000) ("Because the state Act's provisions conflict with . . . the federal Act, it is preempted, and its application is unconstitutional, under the Supremacy Clause.").

Nevertheless, it is unnecessary to resolve this issue here because ThermoLife has not properly raised a preemption challenge in its moving papers.  As noted, the argument is raised only in passing in a footnote on the last page of ThermoLife's brief.  This is insufficient, particularly for a claim of this significance.  *In re Allstate Life Ins. Co. Litig.*, 2013 WL 5974916, *1 (D. Ariz. 2013) ("A footnote is the wrong place for substantive arguments on the merits of a motion, particularly where such arguments provide independent bases for dismissing a claim not otherwise addressed in the motion.") (internal quotation marks omitted); *Hilao v. Estate of Marcos*, 103 F.3d 767, 778 n.4 (9th Cir. 1996) ("The summary mention of an issue in a footnote, without reasoning in support of the appellant's argument, is insufficient to raise the issue on appeal.").  Thus, the Court will deny ThermoLife's motion to dismiss as to the PTPA counterclaim.  If ThermoLife chooses to properly raise a preemption challenge to that counterclaim during a future stage of this case, it is strongly encouraged to comply with Rule 5.1.

…

…

## II.   Motion To Strike

ThermoLife also seeks to strike certain factual allegations within HumanN's pleading.  (Doc. 97 at 2-5).

### A.   **Legal Standard**

A court may strike from a pleading "an insufficient defense or any redundant, immaterial, impertinent, or scandalous matter."  Fed. R. Civ. P. 12(f).  A statement is not immaterial if it "relates directly to the plaintiff's underlying claim for relief."  *Whittlestone, Inc. v. Handi-Craft Co.*, 618 F.3d 970, 974 (9th Cir. 2010).  A statement is not impertinent if it "pertains directly to the harm being alleged."  *Id.*  Rule 12(f) is not a vehicle to challenge the legal sufficiency of claims or allegations.  *Id.*

Motions to strike under Rule 12(f) are "viewed with disfavor and are not frequently granted."  *Operating Eng'rs Local 324 Health Care Plan v. G & W Constr. Co.*, 783 F.3d 1045, 1050 (6th Cir. 2015).[13]   Some district courts have concluded that "[a] motion to strike should not be granted unless the matter to be stricken clearly could have no possible bearing on the subject of the litigation.  If there is any doubt whether the portion to be stricken might bear on an issue in the litigation, the court should deny the motion."  *Platte Anchor Bolt, Inc. v. IHI, Inc.*, 352 F. Supp. 2d 1048, 1057 (N.D. Cal. 2004) (citations omitted).

### B.   **Challenged Allegations**

ThermoLife moves to strike two categories of allegations from HumanN's pleading: (1) allegations that ThermoLife is a patent troll (Doc. 83 ¶¶ 27-37) and (2) allegations concerning Kramer's criminal history (*id.* ¶¶ 55-61).  (Doc. 97 at 3-6.)

#### 1.   Patent Troll Allegations

The first set of challenged allegations assert that ThermoLife "makes money by forcing companies wishing to market N-O supplement products to purchase non-exclusive

---

[13]   *See generally* 1 Gensler, Federal Rules of Civil Procedure, Rules and Commentary, Rule 12, at 314-15 (2018) ("[M]otions to strike under Rule 12(f) are generally viewed with disfavor, perhaps because experience with dubious Rule 12(f) motions has led courts to view them skeptically. Thus, while courts acknowledge that motions to strike can serve legitimate ends, they certainly do not encourage lawyers to file them.").

1    sub-licenses" or, in other words, that ThermoLife is a "patent troll."  (Doc. 83 ¶¶ 28-29.)

2    HumanN cites various cases and statistics that purport to support these allegations.  (*Id.*

3    ¶¶ 29, 33-35, 37.)

4          Although ThermoLife argues that all allegations in paragraphs 27-37 should be

5    stricken, ThermoLife only takes specific issue with the allegations concerning the

6    *Myogenix* litigation.  (Doc. 97 at 3 ["The sole basis for HumanN's allegations here is the

7    filings in the [*Myogenix*] litigation."].)  The Court declines to strike these allegations under

8    Rule 12(f) because they are potentially relevant to this case.  HumanN's attempted

9    monopolization counterclaim, for example, is based in part on allegations that ThermoLife

10   has engaged in a series of objectively baseless lawsuits in an effort to dominate the market.

11   Although the Court dismissed that counterclaim due to HumanN's failure to properly allege

12   the relevant product market, HumanN was granted leave to amend, so the allegations may

13   still be relevant.  At this stage, the Court cannot say the allegations are immaterial,

14   impertinent, scandalous, or otherwise have no bearing on the litigation.

15         ThermoLife also argues that HumanN's allegations concerning the *Myogenix*

16   litigation are false.  (Doc. 97 at 3-4.)  HumanN responds that a Rule 12(f) motion to strike

17   is an improper vehicle for challenging the factual accuracy of allegations in a pleading.

18   (Doc. 103 at 2.)  The Court agrees with HumanN.  *Whittlestone*, 618 F.3d at 974.

19         Accordingly, the Court denies ThermoLife's motion to strike paragraphs 27-37.

20   The Court also denies, as moot, ThermoLife's request for judicial notice of certain

21   unspecified court filings.  (Doc. 97 at 3 n.6.)

22                2.    <u>Criminal History Allegations</u>

23         ThermoLife also moves to strike, as irrelevant, HumanN's allegations concerning

24   Kramer's criminal history.  (Doc. 97 at 4-5.)  HumanN responds that the allegations are

25   relevant because Kramer's "reputation for lawlessness and violence" helped ThermoLife

26   "coerce and extort monies from victims."  (Doc. 103 at 2-3.)

27         Although the issue presents a close call, particularly in light of the fact that

28   HumanN's counterclaim for civil extortion has now been dismissed without leave to

amend, the Court will deny the motion to strike these allegations.  HumanN's remaining counterclaims are based in part on a 2018 email that Kramer sent to HumanN in which he threatened to "kill[]," "systematically dismantle," "crippl[e]," "skin[] . . . alive," "declare war" on, and launch a "full legal assault" on HumanN and its products.  (Doc. 83 ¶¶ 63-65.)  According to HumanN, this email was part of a broader campaign by Kramer and ThermoLife to coerce and pressure HumanN.  Given this backdrop, it is at least possible that the challenged allegations concerning Kramer's criminal history—which suggest that Kramer has been involved in several incidents in which he was charged with and/or convicted of assault—could have some bearing on HumanN's position that it perceived Kramer's threats to be genuine.  And "[i]f there is any doubt whether the portion to be stricken might bear on an issue in the litigation, the court should deny the motion." *Platte Anchor Bolt,* 352 F. Supp. 2d at 1057.

This is not, to be clear, a ruling that Kramer's criminal history will be admissible at trial in this matter.  In its reply, ThermoLife argues that because the allegations relate to incidents "all occurring between February 2000 and March 2009," they are "inadmissible" under Rule 609(a) because they "are more than 10 years old."  (Doc. 108 at 3.)  But exclusion under Rule 12(f) doesn't turn on the ultimate admissibility of the challenged information.  As another court concluded under similar circumstances, "while the [criminal history] information may not be admissible, the Court cannot say it is impertinent or immaterial. . . .  [Because] any information regarding Defendant Zabiiaka's criminal charges is already contained in the public record . . . [and] the jury is not provided with the pleadings," "the admissibility of the statements concerning Defendant Zabiiaka's criminal record is better determined by the Court through a motion in limine." *Hockaday v. Aries Logistics, Inc.*, 2015 WL 13752620, *2-3 (D. Wyo. 2015).

…

…

…

…

Accordingly,

**IT IS ORDERED** that ThermoLife's amended motion to strike and dismiss (Doc. 97) is **granted in part and denied in part**.

**IT IS FURTHER ORDERED** that HumanN has 30 days from the date of this Order to file an amended pleading.  HumanN shall, consistent with LRCiv 15.1(a), attach a redlined version of the pleading as an exhibit.  The changes shall be limited to addressing the relevant product market and tortious interference issues discussed above.

Dated this 2nd day of November, 2020.

Dominic W. Lanza
United States District Judge