**WO**

# IN THE UNITED STATES DISTRICT COURT

# FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| ThermoLife International LLC, | No. CV-18-02980-PHX-DWL |
| Plaintiff, | **ORDER** |
| v. | |
| Neogenis Labs Incorporated, | |
| Defendant. | |
| NeoGenis Labs, Incorporated, | |
| Counterclaimant, | |
| v. | |
| ThermoLife International, LLC and Ronald L. Kramer, | |
| Counterdefendants. | |

ThermoLife International, LLC ("ThermoLife") and Human Power of N Company (formerly known as NeoGenis Labs, Inc.) ("HumanN") each hold patents related to the use of nitrate technology.  In this action, ThermoLife alleges that HumanN engaged in false advertising and false marking by, among other things, marking three of its nitrate-related products with inapplicable patent numbers, in violation of state and federal law.  (Doc. 68.) HumanN, in turn, asserts an array of counterclaims against ThermoLife and its founder, Ronald L. Kramer ("Kramer"), including counterclaims for attempted monopolization and tortious interference that were previously dismissed with leave to amend.  (Doc. 113.)

1  HumanN has now filed an amended pleading in an attempt to cure the deficiencies
2  identified in the previous order (Doc. 117) and ThermoLife has again moved to dismiss
3  (Doc. 122).  For the following reasons, ThermoLife's motion is granted in part and denied
4  in part.

5  **DISCUSSION**

6  I.   Legal Standard

7      To survive a motion to dismiss under Rule 12(b)(6), "a party must allege 'sufficient
8  factual matter, accepted as true, to state a claim to relief that is plausible on its face.'"  *In*
9  *re Fitness Holdings Int'l, Inc.*, 714 F.3d 1141, 1144 (9th Cir. 2013) (quoting *Ashcroft v.*
10 *Iqbal*, 556 U.S. 662, 678 (2009)).  "A claim has facial plausibility when the plaintiff pleads
11 factual content that allows the court to draw the reasonable inference that the defendant is
12 liable for the misconduct alleged."  *Id.* (quoting *Iqbal*, 556 U.S. at 678).  "[A]ll well-
13 pleaded allegations of material fact in the complaint are accepted as true and are construed
14 in the light most favorable to the non-moving party."  *Id.* at 1144-45 (internal quotation
15 marks omitted).  However, the court need not accept legal conclusions couched as factual
16 allegations.  *Iqbal*, 556 U.S. at 679-80.  The court also may dismiss due to "a lack of a
17 cognizable legal theory."  *Mollett v. Netflix, Inc.*, 795 F.3d 1062, 1065 (9th Cir. 2015)
18 (internal quotation marks omitted).

19     "When ruling on a Rule 12(b)(6) motion to dismiss, if a district court considers
20 evidence outside the pleadings, it must normally convert the 12(b)(6) motion into a Rule
21 56 motion for summary judgment, and it must give the nonmoving party an opportunity to
22 respond."  *United States v. Ritchie*, 342 F.3d 903, 907 (9th Cir. 2003).  However, a court
23 may consider "certain materials—documents attached to the complaint, documents
24 incorporated by reference in the complaint, or matters of judicial notice—without
25 converting the motion to dismiss into a motion for summary judgment."  *Id.* at 908.

26 II.  ThermoLife's Exhibits

27     As a preliminary matter, HumanN objects to the three exhibits that were attached to
28 ThermoLife's motion.  (Doc. 125 at 3-4.)  Exhibits A and C purport to be printouts from

1  HumanN's website: Exhibit A is an article entitled "Top 9 Nitric Oxide Supplements and
2  Benefits" (Doc. 122-1) and Exhibit C is what appears to be a product page for HumanN's
3  "SuperGrapes Chews" product (Doc. 122-3).  Exhibit B purports to be a letter dated
4  February 26, 2019 that ThermoLife sent to Amazon accusing HumanN of patent
5  infringement.  (Doc. 122-2.)

6       A.      **Exhibits A And C**

7       HumanN argues that Exhibits A and C can't be considered for purposes of the
8  pending Rule 12(b)(6) motion because website printouts are not, in general, subject to
9  judicial notice and "[n]either was attached to or referenced in the Amended
10  Counterclaims."  (Doc. 125 at 3.)  ThermoLife responds that the Court may consider
11  Exhibits A and C because the printouts come from HumanN's own website and are being
12  offered for the limited purpose of establishing HumanN's knowledge of "other
13  supplements that economically compete with N-O supplements."  (Doc. 134 at 7 n.4.)

14       Exhibits A and C were not attached to HumanN's amended counterclaims or
15  incorporated by reference in that pleading, so ThermoLife may rely on those materials only
16  to the extent they are subject to judicial notice.  Under Federal Rule of Evidence 201(b), a
17  court may judicially notice a "fact that is not subject to reasonable dispute" if it is
18  "generally known within the trial court's territorial jurisdiction" or if it "can be accurately
19  and readily determined from sources whose accuracy cannot reasonably be questioned."

20       The purported printouts from HumanN's website are not subject to judicial notice
21  at this stage.  Other courts have found that non-governmental website printouts are not
22  judicially noticeable, even if they come from the non-movant's website.  *See, e.g.*, *Victaulic*
23  *Co. v. Tieman*, 499 F.3d 227, 237 (3d Cir. 2007), *as amended* (Nov. 20, 2007) (district
24  court erred by taking judicial notice of claims on non-movant's website when ruling on
25  motion to dismiss, both because a corporate website is "a marketing tool . . . [often] full of
26  imprecise puffery that no one should take at face value" and because "[t]aking a bare 'fact'
27  that is reflected not in the pleadings, but on a corporate website, and then drawing
28  inferences *against* the non-moving party so as to dismiss its well-pleaded claims on the

basis of an affirmative defense, takes us, as a matter of process, far too afield from the adversarial context of litigation"); *Salazar v. Driver Provider Phx. LLC*, 2020 WL 5748129, *4 (D. Ariz. 2020) (declining to take judicial notice of information appearing on non-movant's website).  *See generally Silver v. Exec. Car Leasing Long-Term Disability Plan*, 466 F.3d 727, 731 n.2 (9th Cir. 2006) (noting that "materials from sources as diverse as Yahoo!Health and the website for the Japanese Circulation Society . . . . were not sufficiently reliable to be judicially noticeable").  Indeed, in at least two recent cases, ThermoLife successfully invoked these principles to fend off requests by adversaries to take judicial notice of party-website information.  *ThermoLife Int'l LLC v. BPI Sports LLC*, 2021 WL 661981, *3 (D. Ariz. 2021); *ThermoLife Int'l LLC v. Sparta Nutrition LLC*, 2020 WL 248164, *1 (D. Ariz. 2020).  ThermoLife makes no effort to explain why these restrictions on judicial notice should "apply to thee but not to me."

Nor is there merit to ThermoLife's argument that the exhibits are judicially noticeable for the limited purpose of assessing HumanN's knowledge of "other supplements that economically compete with N-O supplements."  By ThermoLife's own admission, Exhibits A and C are being offered to "demonstrate[e] *facts* that are common sense because . . . there are other supplements that would help consumers train, increase blood flow or any of the other benefits also attributable to N-O supplementation."  (Doc. 134 at 7 n.1, emphasis added.  *See also* Doc. 122 at 7 [citing Exhibit A to argue that HumanN "fails to explain how or why any of the nitric oxide supplements listed on its own website are not economic substitutes for ThermoLife's patented raw materials and technology"].)  ThermoLife is thus not asking the Court to take judicial notice of HumanN's knowledge but "to assume the truth of the disputed factual assertions contained within" the websites. *Cf. ThermoLife Int'l LLC v. NeoGenis Labs Inc.*, 2020 WL 6395442, *4 (D. Ariz. 2020).  The Court declines the invitation.  Whether the statements on HumanN's website actually contradict HumanN's theory of liability is a factual question to be resolved, if necessary, at a different stage of this litigation.

…

- 4 -

B.    **Exhibit B**

ThermoLife seeks to dismiss HumanN's counterclaim for tortious interference with business expectancy.  (Doc. 117 ¶¶ 77-89, 121-31.)  That claim is predicated on the allegation that, "on or about March 8, 2019," Kramer and ThermoLife falsely "reported to" Amazon that several HumanN products listed on Amazon's website infringed a particular patent—the '531 patent—held by ThermoLife.  (*Id.* ¶ 79.)  HumanN alleges these reports of infringement were set forth in a "March 2019 letter."  (*Id.* ¶ 83.)

Exhibit B is a letter that ThermoLife purportedly sent to Amazon.  (Doc. 122-2.)  It is dated February 26, 2019.  (Doc. 122-2.)  Significantly, although this letter accuses HumanN of infringing an array of other patents held by ThermoLife, there is no mention of the '531 patent.  (*Id.*)  ThermoLife argues this letter is subject to judicial notice because it "is the March 8, 2019 letter specifically referenced in Paragraph 79 of the Amended Counterclaims."  (Doc 122 at 10 n.6.)  ThermoLife further argues that the letter not only requires dismissal of HumanN's tortious interference claim, but also potentially subjects HumanN's counsel to Rule 11 sanctions, because it shows that ThermoLife never made *any* infringement allegations to Amazon related to the '531 patent (let alone false accusations offered in bad faith).  (Doc. 122 at 1-2, 9-11; Doc. 134 at 9-11.)  HumanN responds that Exhibit B can't be considered at the motion-to-dismiss stage because it "was not attached to the pleadings" and "is not accepted by all parties as authentic."  (Doc. 125 at 2, 4-5, 16.)

As an initial matter, although ThermoLife argues the Court may consider Exhibit B via "judicial notice," its arguments are in essence that the letter was incorporated by reference.  "Unlike rule-established judicial notice, incorporation-by-reference is a judicially created doctrine that treats certain documents as though they are part of the complaint itself."  *Khoja v. Orexigen Therapeutics, Inc.*, 899 F.3d 988, 1002 (9th Cir. 2018).  "[A] defendant may seek to incorporate a document into the complaint if the plaintiff refers extensively to the document or the document forms the basis of the plaintiff's claim."  *Id.* (internal quotation marks omitted).  "However, if the [would-be

incorporated] document merely creates a defense to the well-pled allegations in the complaint, then that document did not necessarily form the basis of the complaint. Otherwise, defendants could use the doctrine to insert their own version of events into the complaint to defeat otherwise cognizable claims.  Submitting documents not mentioned in the complaint to create a defense is nothing more than another way of disputing the factual allegations in the complaint . . . ."  *Id.* at 1002-03 (citations omitted).  Accordingly, "what inferences a court may draw from an incorporated document should . . . be approached with caution."  *Id.* at 1003.  For example, it is "improper to assume the truth of an incorporated document if such assumptions only serve to dispute facts stated in a well-pleaded complaint.  This admonition is . . . consistent with the prohibition against resolving factual disputes at the pleading stage."  *Id.*

Applying these standards, the February 2019 letter was not incorporated by reference into HumanN's pleading (and, thus, may not be considered for purposes of resolving ThermoLife's motion to dismiss).  First, the incorporation-by-reference doctrine applies only to documents whose authenticity is not questioned by the parties.  *See, e.g.*, *Knievel v. ESPN*, 393 F.3d 1068, 1076 (9th Cir. 2005) ("We have extended the 'incorporation by reference' doctrine to situations in which the plaintiff's claim depends on the contents of a document, the defendant attaches the document to its motion to dismiss, and the parties do not dispute the authenticity of the document, even though the plaintiff does not explicitly allege the contents of that document in the complaint.").  *See also* 1 Gensler, Federal Rules of Civil Procedure, Rules and Commentary, Rule 12, at 335 (2021) ("[T]he court may consider documents not attached to the complaint if the complaint specifically refers to them, they are central to the claim, and *their authenticity is not in dispute*.") (emphasis added).  Here, HumanN expressly disputes the authenticity of the February 2019 letter, arguing that it was "not attached to a witness declaration," "there is no affidavit from a records custodian," and "though sought in HumanN's discovery requests half-a-year ago, ThermoLife only produced [the letter] in discovery . . . after bringing its instant motion."  (Doc. 125 at 5, emphasis omitted.)  These are reasonable

grounds for objecting to the authenticity of the letter and ThermoLife makes no attempt to address them in its reply.  Second, it is not apparent that Exhibit B is, in fact, the disputed communication on which HumanN's tortious interference claim is based.  HumanN alleges that the offending communication took place "on or about March 8, 2019" and was set forth in a "March 2019 letter" (Doc. 117 ¶¶ 79, 83), yet Exhibit B is dated February 26, 2019 (Doc. 122-2 at 1).  Those dates are obviously not the same, and HumanN suggests that ThermoLife actually sent a different letter to Amazon that included allegations related to the '531 patent.  (Doc. 125 at 4 ["ThermoLife also fails to show that, even if Exhibit B was sent to Amazon, it was the *only* communication with Amazon alleging infringement."].)  It would be improper to consider Exhibit B under these circumstances, as doing so would "insert [ThermoLife's] version of events into the complaint to defeat otherwise [potentially] cognizable claims."  *Khoja*, 899 F.3d at 1002.

III.    Attempted Monopolization

    A.    **Background**

In its original pleading, HumanN included a counterclaim for attempted monopolization in violation of § 2 of the Sherman Act.  (Doc. 83 ¶¶ 79-87.)  This counterclaim was premised in part on a lawsuit that ThermoLife filed against HumanN in June 2016 and then voluntarily dismissed in January 2018.  (*Id.*)  HumanN alleged this was a "sham" lawsuit intended to "wrongfully block anyone else, including specifically HumanN, from selling N-O supplement products in the United States."  (*Id.* ¶¶ 81-82.)  HumanN also alleged that ThermoLife and Kramer had engaged in other baseless patent litigation, and made threats of other baseless patent litigation, that in tandem with the 2016 lawsuit "achieved a dangerous probability of success of monopolizing the relevant market."  (*Id.* ¶¶ 83-86.)

In April 2020, ThermoLife moved to dismiss this claim on three grounds: (1) *Noerr-Pennington* immunity; (2) failure to define the relevant market; and (3) failure to allege a dangerous probability of acquiring monopoly power.  (Doc. 97 at 7-12.)

The Court addressed these arguments in a November 2020 order.  (Doc. 113 at 8-

19.)  As for the first argument, the Court concluded that "HumanN has adequately pleaded that ThermoLife engaged in sham litigation and sham out-of-court communications" and that such showings "negate ThermoLife's claimed entitlement to *Noerr-Pennington* immunity." (*Id.* at 8-16.)  The Court also rejected the third argument because HumanN's "allegations are sufficient to allege a dangerous probability of achieving monopoly power." (*Id.* at 18-19.)  Finally, the Court agreed with the second argument because, although HumanN had alleged in conclusory fashion that the relevant market was "N-O supplement products in the United States," it hadn't further alleged, "among other things, what the N-O supplementation market is, what general products it includes, whether the N-O supplementation market is a general market or a sub-market of the broader dietary supplement market, and whether different supplement products are reasonably interchangeable for the same use as N-O supplement products." (*Id.* at 17-18.)  Because these deficiencies could potentially be cured by amendment, HumanN was granted leave to amend.  (*Id.* at 18.)

In December 2020, HumanN filed an amended pleading.  (Doc. 117 ¶¶ 38-52.)  As discussed in more detail below, HumanN again alleges that the relevant market is "the N-O supplementation market in the United States" but now clarifies that this market "is distinct from the broader dietary supplement market" because, unlike regular dietary supplements, "N-O supplementation products tend to be marketed to, and purchased by, persons who wish to benefit from the specific advantages of N-O supplementation." (*Id.* at 44 & ¶¶ 38-39.)  HumanN further alleges that vegetables are not a "reasonable substitute" for N-O supplements, even though they "can be a rich source of dietary nitrates," because "consuming the volume of vegetables needed to attain sufficient levels of nitrates is inconvenient and/or difficult for many, and may also be time-consuming." (*Id.* ¶ 40.)

HumanN also alleges that the relevant market can be divided into three submarkets. (*Id.* ¶ 42.)  The first, the "bulk" submarket, is focused on "persons engaged in weight-training or body building." (*Id.*)  The second, the "fitness" submarket, is focused on "persons seeking to improve fitness and to obtain the general wellness benefits of an

increased oxygenated blood supply." (*Id.*)   The third, the "endurance" submarket, is focused on "those seeking to enhance endurance, including, for example, elite athletes in the fields of cycling and swimming." (*Id.*)   HumanN does not allege how large each submarket is in relation to the others or otherwise quantify how much of the overall market each submarket comprises.

As for ThermoLife's market power in each submarket, HumanN alleges that ThermoLife "currently enjoys market power" in the bulk submarket and identifies, by name, 26 different companies—all of which are licensees of ThermoLife—that sell N-O supplements in the bulk submarket. (*Id.* ¶¶ 46-47.)   The products sold by these licensees include "the world's top-selling pre-workout product" and "the number one top earning pre-workout in 2019." (*Id.* ¶ 47.)   As for the fitness and endurance submarkets, HumanN alleges that ThermoLife "has considerable influence" in them. (*Id.* ¶ 48.)   HumanN further alleges that its products compete in those submarkets—Neo40 and SuperBeets are fitness products while BeetElite is an endurance product—but ThermoLife and Kramer have attempted to "stifle competition" through various means, including by "seek[ing] to force HumanN out of the N-O supplementation market if HumanN does not agree to pay royalties to ThermoLife for patents that HumanN does not practice." (*Id.* ¶¶ 42, 50-51.)

All told, HumanN alleges that ThermoLife is "openly seek[ing] a monopoly in the overall N-O supplementation market, including in the fitness and endurance submarket" (*id.* ¶ 48), that this attempt "has a real danger of succeeding" (*id.* ¶ 52), and that such success would result in "injury to consumers as companies selling N-O supplementation products must increase their prices to pay Kramer and ThermoLife their demanded royalties" (*id.* ¶ 52).

B.   **Analysis**

ThermoLife contends that HumanN's new allegations "fall well short of answering the questions the Court posed to HumanN in dismissing the original attempted monopolization claim." (Doc. 122 at 4-9; Doc. 134 at 2-9.)   First, ThermoLife argues that HumanN's market definition is flawed because "HumanN fails to identify a single product

in this market other than its own" and offers a "circular" definition (*i.e.,* "HumanN's answer is the market where people purchase N-O supplementation"). (Doc. 122 at 5-6; Doc. 134 at 2-3.) Next, ThermoLife argues that HumanN's market definition is artificially narrow because HumanN "fails to provide any factual reason as to why a market should be drawn around N-O supplements" and doesn't explain why any number of other products—including the "nitric oxide supplements listed on [HumanN's] own website," Gatorade, and Super Grapes, HumanN's "own alternative non-nitric oxide boosting product"—might be considered "logically, and reasonably, interchangeable" products. (Doc. 122 at 6-8; Doc. 134 at 5-6.) ThermoLife further argues that, to the extent HumanN is arguing there is a "sub-submarket" within the N-O supplementation market that excludes "bulk" supplements, this constitutes an improper attempt to "identify an extremely narrow selection of consumers who have, at least once, purchased N-O supplements from HumanN and superficially calling that a 'market.'" (Doc. 122 at 8-9.) In a related vein, ThermoLife states that it is "ambiguous[]" whether HumanN is defining the relevant market as "the N-O supplementation market" or the "fitness and endurance submarkets of the N-O market." (*Id.* at 6).[1] Finally, ThermoLife argues that HumanN can't satisfy the "market power" element because (1) to the extent the relevant market is the entire N-O supplementation market, HumanN made a "dispositive" concession in its response brief that precludes liability (Doc. 134 at 3); and (2) to the extent the relevant market is the fitness and endurance submarket, HumanN can't prevail because it acknowledges that ThermoLife lacks market power in those submarkets (Doc. 122 at 6 n.4; Doc. 134 at 3-4).

HumanN disagrees that its market definition is artificial or too narrow and argues that the question of market definition is, in any event, largely a factual one for the jury and not proper to assess at the motion-to-dismiss stage. (Doc. 125 at 4-15.)

…

---

[1]   In reply, ThermoLife again accuses HumanN of providing inconsistent definitions of the relevant market. (Doc. 134 at 2 ["At times, HumanN appears to contend that the 'relevant market' is the N-O Supplementation Market (a submarket of the dietary supplements market). At other times, HumanN asserts that the relevant market is a submarket or sub-submarket related to endurance or fitness."].)

1                      1.      <u>Relevant Market</u>

2          "[T]o state a valid claim under the Sherman Act [for attempted monopolization], a

3    plaintiff must allege that the defendant has market power within a 'relevant market.'  That

4    is, the plaintiff must allege both that a 'relevant market' exists and that the defendant has

5    power within that market."  *Newcal Indus., Inc. v. Ikon Off. Sol.*, 513 F.3d 1038, 1044 &

6    n.3 (9th Cir. 2008).   However, because "[t]here is no requirement that these elements of

7    the antitrust claim be pled with specificity," an "antitrust complaint therefore survives a

8    Rule 12(b)(6) motion unless it is apparent from the face of the complaint that the alleged

9    market suffers a fatal legal defect."  *Id.* at 1045.  "And since the validity of the 'relevant

10   market' is typically a factual element rather than a legal element, alleged markets may

11   survive scrutiny under Rule 12(b)(6) subject to factual testing by summary judgment or

12   trial."  *Id.* (emphasis added).  Thus, dismissal is not warranted at the Rule 12(b)(6) stage

13   unless the market definition is "facially unsustainable."  *Id.*

14          Applying these standards, HumanN's new allegations pertaining to the definition of

15   the relevant market are sufficient to survive dismissal.  As noted, HumanN now specifically

16   alleges that the N-O supplementation market "includ[es] N-O supplements like Neo40, and

17   N-O supplementation functional foods, like SuperBeets and BeetElite," that are "marketed

18   to, and purchased by, persons who wish to benefit from the specific advantages of N-O

19   supplementation" (Doc. 177 ¶¶ 38-39), which advantages are defined elsewhere to include

20   "improved circulation and all its associated benefits, including the support of a healthy

21   blood pressure, increased energy, and more" (*id.* ¶ 12) and/or increased bulk, fitness

22   (including "an increased oxygenated blood supply"), or endurance (*id.* ¶ 42).  HumanN

23   further identifies some goods that are excluded from the N-O supplementation market,

24   including "certain vegetables [which are] a rich source of dietary nitrates."  (*Id.* ¶ 40.)

25   Finally, and contrary to ThermoLife's claim that HumanN has only defined the market by

26   circular reference to the consumers who purchase N-O supplementation products, HumanN

27   specifically identifies more than two dozen companies that sell products and compete in

28   the market.  (*Id.* ¶ 46.)  Accordingly, although the previous iteration of HumanN's antitrust

claim was deficient because HumanN had not alleged "what the N-O supplementation market is" or "what general products it includes" (Doc. 113 at 17), those omissions have now been addressed.

ThermoLife's next contention—that HumanN's market definition is artificially narrow and fails to account for substitutes—fares no better as a Rule 12(b)(6) dismissal argument. As an initial matter, there is no merit to ThermoLife's contention that HumanN has offered "ambiguous" or inconsistent definitions of the relevant market. (Doc. 122 at 6; Doc. 134 at 2.) The amended pleading makes clear that the relevant market is the "N-O supplementation market." (Doc. 177 at 44 & ¶ 38.) Although the amended pleading also alludes to the existence of three submarkets within this market (the bulk, fitness, and endurance submarkets), it clarifies that the antitrust claim is based on ThermoLife's attempt to monopolize the overall N-O supplementation market, not any of the submarkets. (*Id.* ¶ 48 ["ThermoLife openly seeks a monopoly in the overall N-O supplementation market, including in the fitness and endurance submarket."]; *id.* ¶ 52 [discussing "Kramer and ThermoLife's intent to achieve monopoly power in the N-O supplementation market, including in the fitness and endurance sub-market"].) This point is further clarified in HumanN's response brief. (Doc. 125 at 9 ["ThermoLife's arguments devolve to . . . misstatements . . . and odd misconstructions, including that HumanN 'sever[ed] body builders from the 'market' at issue . . . .' But the bulk submarket is *part* of the N-O Supplementation Market . . . . While there is market differentiation within this broader N-O Supplementation Market, ThermoLife is working to exploit its dominance in the bulk submarket to obtain general market power within the entire N-O Supplementation Market."].) Thus, to the extent ThermoLife's artificial-narrowness argument presupposes that the product market at issue is the fitness and endurance submarket, that argument is unavailing.

Turning back to the merits, HumanN has plausibly alleged why the N-O supplementation market is distinct from the broader dietary supplement market. As noted, HumanN alleges that consumers ingest N-O supplements in the hope of obtaining specific

benefits, including increased bulk, fitness (arising from "an increased oxygenated blood supply"), or endurance. (*Id.* ¶ 42.) This differentiates N-O supplements from other dietary supplements intended for other purposes. To take one example, some dietary supplements are intended to reduce bulk, not increase it. Accordingly, although the previous iteration of HumanN's antitrust claim was deficient because HumanN had not alleged "whether the N-O supplementation market is a general market or a sub-market of the broader dietary supplement market" (Doc. 113 at 17), that omission has now been addressed.

As for HumanN's alleged failure to account for substitutes and interchangeable products, ThermoLife's arguments on this issue are premised in significant part on Exhibits A and C. (Doc. 122 at 7-8 & n.5.) But as discussed in Part II.A above, those documents are not properly before the Court at this juncture. More fundamentally, a motion to dismiss is not the appropriate vehicle for conclusively resolving whether the products discussed in Exhibit A and C, or Gatorade, or perhaps some other product might be an adequate substitute for products in the N-O supplementation market. Because there is no requirement that the market definition "be pled with specificity," HumanN is entitled to "survive scrutiny under Rule 12(b)(6) subject to factual testing by summary judgment or trial." *Newcal*, 513 F.3d at 1044. An antitrust claim will survive a motion to dismiss "unless it is apparent from the face of the complaint that the alleged market suffers a fatal legal defect," but ThermoLife's argument is, in essence, that HumanN's alleged market suffers from fatal *factual* defects. HumanN's allegations concerning the contours of the relevant market—which explicitly address why one category of potential substitutes (vegetables) shouldn't be considered substitutes—are not facially unsustainable. *Cf. Datel Holdings Ltd. v. Microsoft Corp.*, 712 F. Supp. 2d 974, 997 (N.D. Cal. 2010) ("Viewing the allegations in the light most favorable to Plaintiff, the Court concludes that Plaintiff has not improperly ignored products that may be reasonably interchangeable ones, but instead has included two products in the alleged market and alleged differences regarding others that plausibly exclude them from the relevant market.").

ThermoLife's cited cases do not compel a different result. In *America Online, Inc.*

*v. GreatDeals.Net*, 49 F. Supp. 2d 851 (E.D. Va. 1999), the alleged "relevant market [was] e-mail advertising and that AOL control[led] a distinct sub-market based on the Internet subscribers who are accessed through AOL facilities." *Id.* at 857.   In other words, the claimant alleged that AOL had market power in the "sub-market based on the Internet subscribers who [were] accessed through" its *own facilities*. *Id.*  The language upon which ThermoLife relies—that "it is improper to define a market simply by identifying a group of consumers who have purchased a given product"—was limited to a market definition of consumers that purchased a product from the antitrust defendant. *Id.*  HumanN has not limited its market definition solely to ThermoLife's products or its own products. Similarly, in *Coffee.org, Inc. v. Green Mountain Coffee Roasters, Inc.*, 2012 WL 511485 (W.D. Ark. 2012), the court rejected a market definition that only included the "single, licensed K-cup product." *Id.* at *5.  In contrast, HumanN hasn't offered a market definition that only includes ThermoLife's products.[2]

## 2.   Market Power

The final set of arguments made by ThermoLife concern the issue of market power. Some of those arguments (Doc. 122 at 6 n.4; Doc. 134 at 3-4) can be disregarded because they rest on the premise that HumanN excluded "bulk" products from its market definition. As discussed, that premise is mistaken—the relevant product market, as alleged by HumanN, is the N-O supplementation market in its entirety, inclusive of the bulk, fitness, and endurance submarkets.

ThermoLife's remaining argument turns on a statement in HumanN's response brief—specifically, the statement that "while *ThermoLife does not yet have market power*

---

[2]       In other cases cited by ThermoLife, the plaintiff provided far less detail than HumanN provided in its amended pleading.  *See, e.g.*, *LAI v. USB-Implementers Forum, Inc.*, 2014 WL 12600969, *5 (C.D. Cal. 2014) (relevant market was "reversible USB connectors" and complaint "contain[ed] only one sentence that could be construed as justifying the exclusion of all other types of USB connectors from this market"); *B.V. Optische Industrie De Oude Delft v. Hologic, Inc.*, 909 F. Supp. 162, 17 (S.D.N.Y. 1995) (relevant market was "chest equalization radiography," the complaint only stated that "at all relevant times, no persons other than the parties hereto have had the capacity to provide chest equalization radiography equipment in the United States," and the complaint "offer[ed] [no] explanation for why they are defining the relevant product market in such narrow terms").

1    *over the entire N-O Supplement Market*, it does have influence over the bulk submarket—

2    and has designs to further its ability to restrain competition over the entire market." (Doc.

3    125 at 8, first emphasis added.) According to ThermoLife, the italicized language is

4    "dispositive on whether the N-O Supplementation market can serve as the relevant market

5    here; it can't." (Doc. 134 at 3.)

6        ThermoLife is correct. "[T]o state a valid claim under the Sherman Act, a plaintiff

7    must allege that the defendant has market power within a relevant market." *Newcal*, 513

8    F.3d 1044 (internal quotation marks omitted). After all, "[w]ithout market power to

9    increase prices above competitive levels, and sustain them for an extended period, a

10    predator's actions do not threaten consumer welfare." *Rebel Oil Co. v. Atl. Richfield Co.*,

11    51 F.3d 1421, 1434 (9th Cir. 1995). Thus, a failure to allege power in the relevant market

12    is fatal to an attempted monopolization claim. *See, e.g.*, *Rick-Mik Enterprises, Inc. v.*

13    *Equilon Enterprises LLC*, 532 F.3d 963, 972-73 (9th Cir. 2008) (affirming dismissal of

14    antitrust claim because "the market power allegations of Rick-Mik's complaint are

15    inadequate"); *SC Innovations, Inc. v. Uber Techs., Inc.*, 434 F. Supp. 3d 782, 794-95 (N.D.

16    Cal. 2020) (dismissing attempted monopolization claim due to "failure to allege cognizable

17    market power"); *Unigestion Holdings, S.A. v. UPM Tech., Inc.*, 412 F. Supp. 3d 1273, 1286

18    (D. Or. 2019) (dismissing antitrust claim where complaint lacked allegations that the

19    antitrust defendant had "monopoly power *in the relevant product market*"); *ChriMar Sys.,*

20    *Inc. v. Cisco Sys., Inc.*, 72 F. Supp. 3d 1012, 1019-20 (N.D. Cal. 2014) ("HP's failure to

21    sufficiently allege market power is fatal to its attempted monopolization claim . . . .").[3]

22        A plaintiff asserting a claim for attempted monopolization does not, to be clear, face

23    a particularly high bar in pleading the existence of market power. The Ninth Circuit has

24    emphasized that, because "the existence or non-existence of that market power is a factual

25    question," it is often inappropriate to resolve "the market power question on a Rule 12(b)(6)

26    motion." *Newcal*, 513 F.3d at 1052. But although the pleading standards in this area are

27

28    _____

[3]    *Rick-Mik* concerned a claim for illegal tying under § 1 of the Sherman Act, but the Ninth Circuit has made clear that "[t]he 'relevant market' and 'market power' requirements apply identically under [both § 1 and § 2] of the Act." *Newcal*, 513 F.3d at 1044 n.3.

not onerous, they still exist.  Dismissal of an antitrust complaint is required when the market power allegations are deficient, regardless of the adequacy of the market definition. *See, e.g., Top Rank, Inc. v. Haymon*, 2015 WL 9948936, *7-8 (N.D. Cal. 2015) ("Although the Court concludes that Top Rank's definitions of the relevant markets survive the pleading stage, the Court concludes that Top Rank has failed to adequately allege market power or economic power within those markets."). *See generally Endsley v. City of Chicago*, 230 F.3d 276, 282 (7th Cir. 2000) ("[P]laintiffs argue that the district judge erred in taking up the question of market power on a motion to dismiss.  He did not.  We acknowledge that frequently, questions of whether the defendant possessed the requisite market power to establish a monopoly are addressed in a motion for summary judgment or trial.  However, where plaintiffs fail to identify any facts from which the court can infer that defendants had sufficient market power to have been able to create a monopoly, their § 2 claim may be properly dismissed.") (citations and internal quotation marks omitted).

In general, "[m]arket power may be demonstrated through either of two types of proof." *Rebel Oil*, 51 F.3d at 1434.  The first is "direct evidence of the injurious exercise of market power," which can be shown through "evidence of restricted output and supracompetitive prices." *Id.*  The second and "more common" approach is to present "circumstantial evidence pertaining to the structure of the market," including evidence "that the defendant owns a dominant share of that market." *Id.*  Here, it appears that HumanN is pursuing the second approach.  Its amended pleading contains no allegations— or, at least, no non-conclusory allegations—concerning restricted output or supracompetitive prices (which is the first way to prove market power)[4] and is replete with allegations concerning ThermoLife's control over certain aspects of the N-O

---

[4]      The only mention of prices in the relevant portion of HumanN's pleading comes in paragraph 52, which alleges that "Kramer and ThermoLife's attempt to monopolize the N-O supplementation market has a real danger of succeeding, with resulting injury to consumers as companies selling N-O supplementation products must increase their prices to pay Kramer and ThermoLife their demanded royalties."  Not only is the allegation of increased prices conclusory and fact-free, but it is unclear whether HumanN is claiming that the increased prices have already come into effect or is simply predicting that prices will increase in the future if ThermoLife succeeds on its alleged monopolization plan.

supplementation market (which is the second way).  Among other things, HumanN alleges that ThermoLife touts itself as the "world leader" in nitrate technology for dietary supplements (Doc. 117 ¶ 43), has an interest in "many of the top-selling dietary supplements in the world" (*id.* ¶ 44), claims that, "[w]ith few exceptions," its technology is present any time an amino acid is combined with nitrates and sold to consumers (*id.* ¶ 45), and has "captured dozens of companies in [the bulk] submarket" (*id.* ¶ 46).

In its previous motion to dismiss, ThermoLife only challenged the sufficiency of HumanN's allegations related to market power on one specific ground—that HumanN hadn't alleged, in percentage terms, the share of the market controlled by ThermoLife. (Doc. 97 at 11-12.)  The Court rejected this argument because, as many courts have recognized, it is unnecessary for an antitrust plaintiff to allege the exact market share controlled by the defendant.  (Doc. 113 at 19, citing *Scooter Store, Inc. v. SpinLife.com, LLC*, 777 F. Supp. 2d 1102 (S.D. Ohio 2011).)[5]  But now, ThermoLife raises a different challenge—it argues that HumanN's claim is deficient because HumanN has affirmatively conceded a lack of market power.  The Court has no choice but to agree.  However forgiving the pleading standards in this area might be, a plaintiff asserting an attempted monopolization claim cannot concede that the defendant currently lacks market power in the relevant market and expect to survive dismissal.

During oral argument, HumanN urged the Court to disregard the concession appearing on page 8 of its response brief (*i.e.*, "ThermoLife does not yet have market power over the entire N-O Supplement Market") because it had intended to say that ThermoLife currently lacks "monopoly power" over the entire market (which would not be fatal to its antitrust claim) and used the term "market power" by mistake.  This explanation is

---

[5]      *See also Top Rank*, 2015 WL 9948936 at *8 (agreeing that an antitrust plaintiff "does not have to allege an exact, percentage-based market share" but dismissing because remaining claims related to market power did not "include enough facts to raise its right to relief above the speculative level").  With that said, nothing prevents an antitrust plaintiff from alleging that the defendant controls a specific share of the relevant market, and the Ninth Circuit has suggested that an allegation of a market share exceeding 30% may be sufficient to establish presumptive market power in an attempted monopolization case. *Rebel Oil*, 51 F.3d at 1438.

unpersuasive.  As an initial matter, the disputed passage on page 8 is not the only instance where HumanN stated that ThermoLife currently lacks market power in the overall market. A similar statement appears on page 9.  (Doc. 125 at 9 ["ThermoLife is working to exploit its dominance in the bulk submarket to obtain general market power within the entire N-O Supplementation Market."].)  It seems unlikely there were two typos concerning the same issue on different pages of the brief.

More important, the response brief's descriptions of ThermoLife's market power (or lack thereof) closely track the allegations in HumanN's amended pleading on that topic. As noted above, although paragraphs 46 and 47 assert that ThermoLife "currently possesses market power" in one of the three submarkets (bulk) and provides specific factual allegations in support of that assertion, paragraph 48 then acknowledges ThermoLife only has "considerable influence" in the other two submarkets (endurance and fitness)—which, read in context with paragraphs 46 and 47, is an acknowledgement that ThermoLife currently lacks market power in those two submarkets—and then accuses ThermoLife of "openly seek[ing]" monopoly power in the overall market.  This is just another way of saying that ThermoLife doesn't yet have market power in the overall market but is attempting to leverage its dominance in the bulk submarket to obtain such power—a theory that fails to state a claim under Ninth Circuit law.[6]

Thus, even if the Court were to disregard the statements in HumanN's response brief and evaluate the sufficiency of its attempted monopolization claim based solely on the factual allegations in its pleading, dismissal would be required.  Even if, as HumanN alleges, ThermoLife "openly seeks" a monopoly in the overall N-O supplementation market (Doc. 117 ¶ 49), has the "intent" to obtain such a monopoly (*id.* ¶ 52), and "has designs" to "restrain competition over the entire market" (Doc. 125 at 9), such conduct does not, standing alone, violate the antitrust laws.  Antitrust liability arises only when a

---

[6]     The Court further notes that, because HumanN has not alleged how large the bulk, fitness, and endurance submarkets are in relation to each other, it is impossible to infer from ThermoLife's possession of market power in the bulk submarket that ThermoLife also possesses market power in the overall market.  If, for example, the bulk submarket comprised only 5% of the overall market, ThermoLife's dominance in this particular submarket would not reflect overall market power.

company *with market power* engages in such conduct, and that element is lacking here.  *Cf. ChriMar Sys.*, 72 F. Supp. 3d at 1019-20 ("[A]lthough a lower percentage is required for an attempted monopoly claim, as opposed to an actual monopoly claim, HP must still allege sufficient market power.  Therefore, HP's failure to sufficiently allege market power is fatal to its attempted monopolization claim . . . .").

Accordingly, ThermoLife's motion to dismiss is granted as to HumanN's attempted monopolization claim.  As for whether the dismissal should be with or without leave to amend, HumanN did not request such leave in its response brief but belatedly requested it during oral argument, after reviewing the Court's tentative order.  In response, ThermoLife argued that leave to amend should be denied on futility grounds, because HumanN was already given an earlier opportunity to amend, and because amendment would be prejudicial in light of the fact that this case is already over two years old and discovery is almost closed.

HumanN's request for leave to amend is denied.  This is not a case where a Rule 12(b)(6) dismissal was granted because the underlying pleading was vague or insufficiently detailed or conclusory.  Rather, HumanN's attempted monopolization claim was dismissed because HumanN's extremely detailed allegations, which have been refined through one round of amendment, establish an affirmative lack of market power.  Granting leave to amend in this circumstance would be futile—a party may not use the amendment process to walk back or contradict its earlier factual allegations.  *Reddy v. Litton Indus.*, 912 F.2d 291, 296-97 (9th Cir. 1990) ("It would not be possible for Reddy to amend his complaint to allege a completely new injury that would confer standing to sue without contradicting any of the allegations of his original complaint.  Although leave to amend should be liberally granted, the amended complaint may only allege other facts consistent with the challenged pleading.") (internal quotation marks omitted).

…

…

…

IV.   <u>Tortious Interference</u>

    A.   **Background**

As discussed in Part II.B above, HumanN's claim for tortious inference is premised on the allegation that ThermoLife and Kramer sent a letter to Amazon.com in March 2019 in which they falsely accused HumanN of infringing the '531 patent.  In the November 2020 order, the Court dismissed this claim because HumanN hadn't alleged any facts showing that the false report was made in bad faith—which is a prerequisite to liability when it comes to false claims of patent infringement—but granted leave to amend so HumanN could attempt to cure the deficiency.  (Doc. 113 at 24-27.)

In its amended pleading, HumanN adds an array of new factual allegations concerning the existence of bad faith.  (Doc. 117 ¶¶ 81-86.)  HumanN then summarizes those new allegations as follows:

> Kramer and ThermoLife knew or should have known that SuperBeets and BeetElite do not infringe the '531 Patent.  At the time they sent their March 2019 letter to Amazon, Kramer and ThermoLife had no good faith belief, or any objective basis for a good faith belief, that HumanN's SuperBeets or BeetElite infringe the '531 Patent.  At the time they sent the March 2019 communication to Amazon, Kramer and ThermoLife already were in litigation against HumanN, and knew or should have known that the ingredients of SuperBeets and BeetElite did not include one of the amino acids identified in Claim 1 of the '531 Patent.  Absent such an ingredient, SuperBeets and BeetElite could not practice the '531 Patent.  Kramer and ThermoLife thus sent the March 2019 letter to Amazon knowing that their accusations of infringement were false, and they did so maliciously and with an intent to injure HumanN.

(*Id.* ¶ 127.)

    B.   **Analysis**

ThermoLife moves to dismiss the tortious interference claim on the ground that it remains deficient even after amendment.  (Doc. 122 at 2-3, 9-11.)  ThermoLife's primary argument is that Exhibit B proves that it (and Kramer) never made any allegations of infringement concerning the '531 patent (and, thus, couldn't have made any allegations in bad faith).  But as discussed in Part II.B above, Exhibit B is not properly before the Court.

1    Thus, the Court must accept HumanN's allegation that ThermoLife and Kramer sent a letter

2    to Amazon in March 2019 that falsely accused HumanN of infringing the '531 patent.

3         Alternatively, ThermoLife contends that HumanN's new allegations remain

4    deficient because HumanN still has not set forth "*facts* that support [the] conclusory

5    allegation that ThermoLife and Kramer 'knew or should have known' that HumanN's

6    products do not infringe the '531 Patent." (Doc. 122 at 11.)  This argument lacks merit.

7    HumanN has now provided detailed allegations that ThermoLife's communication

8    concerning the '531 Patent was made in bad faith.  HumanN alleges that its products

9    "demonstrably do not infringe the '531 Patent" because their ingredients "do not have—

10   and have never had—as an ingredient an amino acid from the group" protected by the '531

11   patent. (Doc. 117 ¶¶ 81-82.)  HumanN also alleges that, "[a]t the time [ThermoLife] sent

12   the March 2019 communication to Amazon, Kramer and ThermoLife already were in

13   litigation against HumanN, and knew or should have known that the ingredients of

14   SuperBeets and BeetElite did not include one of the amino acids identified in . . . the '531

15   Patent.   Indeed, in this litigation, ThermoLife claims to have chemically analyzed

16   SuperBeets and BeetElite, and thus must have known that HumanN's labeling was accurate

17   and complete." (*Id.* ¶ 83.)  HumanN further alleges that, "as Kramer and ThermoLife knew

18   or should have known, the '531 Patent was infirm in March 2019," noting that "shortly

19   after Kramer and ThermoLife sent their letter to Amazon, the '531 Patent went into

20   voluntary reexamination." (*Id.* ¶ 85.)  These allegations are sufficient to allege bad faith.[7]

21   _____
         [7]      HumanN also suggests its tortious interference claim should survive dismissal
22   because ThermoLife and Kramer made false, bad-faith allegations of infringement
     concerning the '140 patent.  (Doc. 125 at 16.)  This is something of a red herring.  The
23   relevant paragraphs of HumanN's pleading pertaining to the tortious inference claim only
     discuss the '531 patent.  (Doc. 117 ¶¶ 77-89, 121-23.)  The Court raises this point because
24   HumanN did not, for whatever reason, affirmatively state in its motion papers that it has
     proof that ThermoLife and Kramer sent a letter to Amazon in March 2019 raising
25   infringement allegations concerning the '531 patent (which, again, is the only theory of
     liability set forth in its pleading).  Instead, HumanN simply raised the possibility that such
26   a letter might exist and then faulted ThermoLife for failing to disprove its existence.
     (Doc.125 at 4 ["ThermoLife also fails to show that, even if Exhibit B was sent to Amazon,
27   it was the *only* communication with Amazon alleging infringement.  These are issues for
     discovery and proof, not assumptions on a Rule 12 motion that would be used to contradict
28   the well-pled allegations in the Amended Counterclaims."].)  Although this approach may
     be permissible at the motion-to-dismiss stage, where a non-movant has no obligation to
     produce evidence in support of its claims, it will not be permissible at future stages.

- 21 -

Because ThermoLife does not seek dismissal of the tortious interference claim on any other grounds, ThermoLife's motion to dismiss that claim is denied.

Accordingly,

**IT IS ORDERED** that ThermoLife's motion to dismiss (Doc. 122) is **granted in part and denied in part**.

Dated this 14th day of April, 2021.

_____
Dominic W. Lanza
United States District Judge