**WO**

# IN THE UNITED STATES DISTRICT COURT

# FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| ThermoLife International LLC, | No. CV-18-02980-PHX-DWL |
| Plaintiff, | **ORDER** |
| v. | |
| Neogenis Labs Incorporated, | |
| Defendant. | |
| Neogenis Labs, Incorporated, | |
| Counterclaimant, | |
| v. | |
| ThermoLife International, LLC and Ronald L. Kramer, | |
| Counterdefendants. | |

Pending before the Court are three motions: (1) a motion to compel filed by Human Power of N Company (formerly known as NeoGenis Labs, Inc.) ("HumanN") (Doc. 139); (2) a motion to seal filed by ThermoLife International, LLC ("ThermoLife") (Doc. 156); and (3) a motion for leave to file a sur-reply filed by ThermoLife (Docs. 162).  For the following reasons, the first motion is granted in part and denied in part, the second motion is granted, and the third motion is denied.

…

…

**RELEVANT BACKGROUND**

I.   <u>Overview Of The Parties And Their Claims</u>

ThermoLife, as alleged in its operative complaint, "is a world leader in the use and development of nitrate technology in dietary supplements." (Doc. 68 ¶ 1.) ThermoLife "licenses its patented technology to dietary supplement companies" and also "supplies nitrates, which are necessary to practice many of its patented inventions," to those companies. (*Id.*)

HumanN, too, holds patents related to the use of nitrate technology. (*Id.* ¶ 2.) HumanN also manufactures and sells dietary supplements containing nitrate technology. (*Id.*) Thus, HumanN "competes with ThermoLife and the companies that utilize ThermoLife's patented technology." (*Id.*)

In this action, ThermoLife accuses HumanN of engaging in false advertising, false marking, and unfair competition by, *inter alia*, marking three of its nitrate-related products with inapplicable patent numbers. (*Id.* ¶¶ 209-29.) According to ThermoLife, this misconduct has caused it to suffer "competitive injury" due to its status as "a direct competitor" of HumanN "in the sale of nitrite/nitrate technology." (*Id.* ¶ 215.) Put another way, ThermoLife contends it "has suffered a commercial injury based upon [HumanN's] misrepresentations," which have been "harmful to ThermoLife's ability to compete." (*Id.* ¶¶ 220-22.) Among other remedies, ThermoLife seeks "damages adequate to compensate [ThermoLife] for the competitive injury suffered." (*Id.* at 57.) The damages sought by ThermoLife include compensation for "los[t] profits, market share, and good will." (Doc. 105 at 3 [Rule 26(f) report].)

HumanN denies ThermoLife's allegations and also asserts various counterclaims. (Doc. 117.) The theory underlying HumanN's counterclaims is that ThermoLife and its founder (1) "have engaged in anticompetitive conduct, including assertion of patent rights in sham lawsuits against HumanN and other competitors, and threats of sham lawsuits against HumanN and other competitors, in bad-faith in an attempt to monopolize the nitrate/nitrite supplementation market"; (2) have "engaged in false advertising, unfair

completion, and trade libel by publishing false and derogatory statements regarding HumanN and its products in commercial advertising"; and (3) have "tortiously interfered with HumanN's customer relationships by falsely advising HumanN's customers that its products infringe ThermoLife's patents." (Doc. 105 at 3-4.)

II.     The Discovery Requests And Objections

On or about July 2, 2020, HumanN propounded its first requests for production ("RFPs") (Doc. 139-2) and first set of interrogatories (Doc. 139-3) to ThermoLife. Although these discovery requests sought many different categories of information, only two are relevant here: *first*, HumanN sought the identity of the company that supplies nitrate ingredients to ThermoLife;[1] and *second*, HumanN sought certain communications that ThermoLife exchanged with its customers/licensees.[2]

---

[1]     The discovery requests touching on this category were RFP 12, which sought "DOCUMENTS sufficient to identify the source of the 'raw materials and compounds that are necessary to practice [YOUR] patents' that YOU sell to other PERSONS for use in THERMOLIFE COMPONENT PRODUCTS, including the manufacturer(s) of those raw materials, the type of raw materials supplied by that manufacturer(s) and their specifications, and the date and quantity (as measured by weight and/or units, and dollars) of any purchases of those raw materials from those sources by YOU since January 1, 2010" (Doc. 139-2 at 10), and Interrogatory 3, which asked ThermoLife to "[d]escribe all nitrates or nitrites, including but not limited to, raw materials that provide nitrites or nitrates, that YOU have supplied or currently supply to any PERSON for use in dietary supplements since January 1, 2010, and for each, IDENTIFY the manufacturer of the nitrate and/or nitrites and each PERSON to whom YOU have supplied that nitrate or nitrite for use in dietary supplements" (Doc. 139-3 at 8).

[2]     The discovery requests touching on this category were RFPs 2-4 and 19, which sought, respectively, "All DOCUMENTS CONCERNING any offer, request, demand, or negotiation between YOU and any other PERSON to license or assign any rights to any of the THERMOLIFE PATENTS, including, but not limited to, DOCUMENTS IDENTIFYING the proposed licensee or assignee, COMMUNICATIONS between YOU and any other PERSON involved in the discussions, DOCUMENTS describing the amount and form of any fees or royalties to be paid, and DOCUMENTS describing whether the license or assignment took place, and if not, why not" (Doc. 139-2 at 8 [RFP 2]); "All DOCUMENTS CONCERNING the actual licensing of YOUR 'patented technology' to any CUSTOMER, as alleged in Paragraph 1 of YOUR Second Amended Complaint, including but not limited to DOCUMENTS describing the terms and conditions of any such license between YOU and any CUSTOMER, and the amount and form of any fee or royalties paid pursuant to the license" (*id.* [RFP 3]); "All DOCUMENTS reflecting COMMUNICATIONS between YOU and any PERSON CONCERNING the enforcement of the THERMOLIFE PATENTS" (*id.* [RFP 4]); and "DOCUMENTS CONCERNING or reflecting YOUR plans, analyses, memoranda, and/or COMMUNICATIONS internally or with other PERSONS CONCERNING any efforts or strategy to increase YOUR market share in the U.S. market for nitrate technology, including dietary supplement and/or functional food products combining a nitrate(s) and an amino acid that are sold and marketed to CONSUMERS, including without limitation, any COMMUNICATIONS with

On August 4, 2020, ThermoLife requested, and HumanN agreed to, an extension until August 17, 2020 to respond to these discovery requests.  (Doc. 139-1 ¶ 5.)

On August 17, 2020, ThermoLife requested, and HumanN agreed to, another extension—this time until August 24, 2020—to respond to these discovery requests.  (Doc. 139-4 at 3.)  This request occurred in the midst of settlement negotiations between the parties.  (*Id.*)

On August 18, 2020, HumanN's counsel sent a follow-up email to ThermoLife's counsel regarding the status of the settlement negotiations.  (*Id.* at 2.)  This email set a deadline of August 21, 2020 to make a decision on whether to settle and included the following sentence: "Discovery can wait in the service of an agreement; a decision by ThermoLife on a future relationship cannot."  (*Id.*)[3]

The case did not settle, and ThermoLife did not respond to the discovery requests until October 26, 2020.  (Docs. 139-5, 139-6.)  As for the identity of its supplier, ThermoLife objected on the grounds that (1) the information was irrelevant because "[t]he authenticity of ThermoLife's materials and compounds are not at issue in this lawsuit," and (2) the information was "highly confidential business information that could be used to a competitive advantage against ThermoLife."   (Doc. 139-5 at 10.)   As for its communications with customers/licensees, ThermoLife objected on the grounds that (1) some of the requested communications were protected by the attorney-client privilege, (2) some of the requested communications were irrelevant, (3) "producing the years and years of communications sought here with every current ThermoLife customer[], former ThermoLife customer, and potential ThermoLife customer" would create an undue burden and not be proportional to the needs of the case, (4) to the extent HumanN was seeking the

---

any PERSONS offering to police the market and prevent competition" (*id.* at 12 [RFP 19]).

[3]     As discussed in more detail below, the parties disagree about whether August 24, 2020 remained the applicable discovery-response deadline in light of this email and other interactions between counsel.  In a declaration, HumanN's counsel asserts that "[a]t no time did I ever communicate . . . that ThermoLife would have an extension beyond August 24, 2020, much less an 'open-ended' extension, to respond." (Doc. 139-1 ¶ 6.) Meanwhile, ThermoLife asserts (albeit in unsworn form) that "[i]n telephone conversations, counsel agreed to an open-ended extension."  (Doc. 128 at 3 n.2.)

communications to support its antitrust counterclaim, that counterclaim was subject to a motion to dismiss, and (5) some of the requested communications were covered by the "joint defense privilege." (*Id.* at 2-6.)

III.   The First Discovery-Dispute Hearing

On January 29, 2021, after meet-and-confer efforts proved unsuccessful, the parties sought judicial intervention concerning these (and other) discovery disputes by filing a joint notice summarizing their disputes. (Doc. 128.)

On February 3, 2021, the Court held a lengthy hearing. (Doc. 130 [minute entry]; Doc. 154 [transcript].) As for the identity of ThermoLife's supplier, HumanN argued that it requires this information because it "suspect[s] . . . that [ThermoLife's] product comes from China from unregistered labs"—a suspicion that, if true, would undermine ThermoLife's claim for lost profits because if consumers "knew what the products contained they would not buy them at all." (Doc. 154 at 6.) In response, ThermoLife's counsel stated that the registration issue had never come up during the parties' meet-and-confer sessions, avowed that ThermoLife's supplier "is, quote, registered," and argued that HumanN's true motivation in seeking supplier information wasn't to advance a legitimate claim or defense—instead, it was "solely for purposes of harassment, solely to cause ThermoLife issues with its manufacturer." (*Id.* at 14.) ThermoLife's counsel later added that HumanN was merely "on a fishing expedition looking for improprieties with our manufacturer. There are none." (*Id.* at 15.) As for communications between ThermoLife and its customers/licensees, HumanN argued those communications are relevant to its counterclaim that ThermoLife uses "sham litigation as a tool to effectively corner the market." (*Id.* at 10-11.) In response, ThermoLife argued that "providing all communications with ThermoLife's licensees would essentially require ThermoLife to produce all communications related to its business. Because when it sells its raw materials, it licenses the use of its patents related to those raw materials. . . . So really Human is asking for all communications related to ThermoLife's business forever. That is unquestionably beyond the scope of discovery here." (*Id.* at 23.) ThermoLife also noted

that it had already "provided every communication from any ThermoLife lawyer . . . that ha[s] asserted patent infringement against anyone.  So there are over 100 letters that have been provided to Human[N] asserting infringement of ThermoLife patents.  And that's over roughly an eight-year period."  (*Id.* at 24-25.)

At the conclusion of the hearing, the Court declined to make any definitive rulings concerning the parties' discovery disputes.  (*Id.* at 45-46.)  Instead, the Court ruled that, due to the involved nature of the issues and the need for a more developed record, HumanN would be authorized to file a formal motion to compel.  (*Id.*)  The Court further explained that it was tentatively inclined to conclude that HumanN had a legitimate basis for seeking more information about ThermoLife's supplier but was unsure whether verification that the supplier was "certified" would, alone, be sufficient.  (*Id.* at 48-49.)  As for the communications between ThermoLife and its customers/licensees, the Court stated that "this is an issue that can really profit from some additional meeting and conferring between the parties," in part because there seemed to be "a misperception by Human[N] that the objections were primarily based on privilege, when, in fact, they're based on relevance, overbreadth and undue burden."  (*Id.* at 51.)

IV.   The Filing (And Re-Filing) Of The Motion To Compel And The Sanctions Request

On February 24, 2021, HumanN filed a motion to compel.  (Doc. 135.)  HumanN also attached a variety of exhibits to this motion, including one exhibit that was lodged under seal because ThermoLife had marked it as "Highly Confidential—Attorneys' Eyes Only" pursuant to the protective order[4] in this case.  (Doc. 137-1.)  Among other things, this exhibit identified, by name, a Chinese company with which ThermoLife had done business.  (*Id.*)

As it turns out, ThermoLife hadn't intended to disclose the name of this company to HumanN during the discovery process (and hadn't realized it made the disclosure until reviewing HumanN's motion).  Upon making this realization, ThermoLife's counsel immediately asked HumanN to withdraw the motion and then "resubmit the motion . . .

---

[4]      The protective order was issued on February 21, 2019.  (Docs. 34, 35.)

with this purportedly inadvertently-produced, non-privileged information removed."
(Doc. 138 at 2.)   During this conversation, ThermoLife did not clarify "whether the
identified company is, or has been, one of its manufacturers."  (*Id.*)  HumanN agreed to
ThermoLife's request and withdrew its motion to compel.  (*Id.*)

On February 26, 2021, HumanN refiled its motion to compel, this time omitting the
document in question.  (Doc. 139.)  This is the operative motion now before the Court.

On March 4, 2021—before the briefing process on the motion to compel was
complete—the parties brought another discovery dispute to the Court's attention.  (Doc.
142.)  This dispute focused on ThermoLife's disclosure of the name of the Chinese
company.  (*Id.* at 3.)  ThermoLife requested the imposition of sanctions against HumanN
and its counsel, under the theory that HumanN should have realized that the disclosure of
the company's name was inadvertent and that HumanN's counsel violated Ethical Rule
("ER") 4.4(b) by thereafter attempting to use that information to gain a litigation advantage.
(*Id.*)  HumanN disagreed, arguing that the disclosure wasn't "inadvertent" under the
meaning of ER 4.4(b) because ThermoLife intended to produce the document and the
company's name isn't privileged.  (*Id.* at 2-3.)  HumanN also asserted, in a footnote, that
"the FDA's website . . . demonstrates that [the Chinese company] is not registered with the
FDA.  Thus, ThermoLife's counsel's averment to the Court to the contrary was either
misinformed, mistaken, or false."  (*Id.* at 3 n.2, emphasis omitted.)

On March 5, 2021, the Court held a hearing to address the discovery dispute.  (Doc.
147 [minute entry]; Doc. 155 [transcript].)  During the hearing, HumanN's counsel asserted
that he hadn't even realized, when he first received the disputed document during the
discovery process, that the name of the company listed in the document was "actually a
current supplier" and "assumed it was a former supplier, one that [they] didn't care that we
knew about."  (Doc. 155 at 13.)  ThermoLife's counsel took issue with this explanation,
arguing that "[t]hey knew exactly what they were looking at when they saw it.  And they
knew it a while ago . . . .  [I]t feels to me like they've been playing a game with this Court
for quite some time, and with me for quite some time on this issue."  (*Id.* at 14.)  HumanN's

counsel, in turn, reiterated that he had reasonably "assumed that [ThermoLife's] counsel . . . actually reviewed the documents that he marked. . . .  [H]ere these documents had obviously been reviewed and were obviously marked.  We believed we had the name of the former supplier that [ThermoLife] did not care to name precisely because he had some new secret supplier perhaps." (*Id.* at 16.)  At the conclusion of the hearing, the Court ruled that it would decline to rule on ThermoLife's sanctions request for the time being, because the request was intertwined with the merits of the motion to compel, but ordered HumanN to sequester the disputed document pending future rulings.  (*Id.* at 19.)

On March 12, 2021, ThermoLife filed its response to HumanN's refiled motion to compel.  (Doc. 153.)

On March 19, 2021, HumanN filed a reply.  (Doc. 157.)

## V.    The Sur-Reply Request

On March 23, 2021, ThermoLife filed a motion for permission to file a sur-reply. (Doc. 162.)  Enclosed with the motion was the proposed sur-reply.  (Doc. 162-1.)

On March 24, 2021, HumanN filed an opposition to the request to file a sur-reply. (Doc. 163.)  ThermoLife did not file a reply.[5]

## DISCUSSION

## I.    Motion To Compel

### A.    **Legal Standard**

Rule 37(a)(3)(B)(iv) of the Federal Rules of Civil Procedure provides that "[a] party seeking discovery may move for an order compelling an answer, designation, production, or inspection" when the non-moving party "fails to produce documents . . . as requested under Rule 34."

Rule 26(b), in turn, defines the "Scope and Limits" of discovery.  Under Rule 26(b)(1), "[p]arties may obtain discovery regarding any nonprivileged matter that is relevant to any party's claim or defense and proportional to the needs of the case,

---

[5]    On April 7, 2021, the Court issued a tentative ruling as to the motion to compel, motion to seal, and motion for leave to file a sur-reply.  (Doc. 173.)  On April 13, 2021, the Court heard oral argument on those motions (and on a separate motion to dismiss filed by ThermoLife).  (Doc. 175.)

considering the importance of the issues at stake in the action, the amount in controversy, the parties' relative access to relevant information, the parties' resources, the importance of the discovery in resolving the issues, and whether the burden or expense of the proposed discovery outweighs its likely benefit."[6]  Under Rule 26(b)(1), "[i]nformation . . . need not be admissible in evidence to be discoverable."

As for the burden of proof, "the party seeking to compel discovery has the initial burden of establishing that its request satisfies the relevancy requirements of Rule 26(b)." *Doe v. Swift Transp. Co.*, 2015 WL 4307800, *1 (D. Ariz. 2015).  This "is a relatively low bar."  *Continental Circuits LLC v. Intel Corp.*, 435 F. Supp. 3d 1014, 1018 (D. Ariz. 2020). *See generally* 1 Gensler, Federal Rules of Civil Procedure, Rules and Commentary, Rule 26, at 801-02 (2021) ("For discovery purposes, courts define relevance broadly, stating that information is relevant if it bears on or might reasonably lead to information that bears on any material fact or issue in the action. . . .  [C]ourts are quick to point out that discovery is concerned with relevant information—not relevant evidence—and that as a result the scope of relevance for discovery purposes is necessarily broader than trial relevance.") (footnotes and internal quotation marks omitted).  If the movant meets its burden of establishing relevancy, "the party opposing discovery has the burden to demonstrate that discovery should not be allowed due to burden or cost and must explain and support its objections with competent evidence."  *Doe*, 2015 WL 4307800 at *1.

B. **Analysis**

HumanN seeks to compel ThermoLife to produce three categories of documents

---

[6]     The current version of Rule 26(b)(1) was enacted in 2015.  An earlier version provided that the requested material had to be "relevant to the subject matter involved in the pending action," and the Ninth Circuit has recognized that the change in 2015 (under which "the 'subject matter' reference [was] eliminated from the rule, and the matter sought must [now] be 'relevant to any party's claim or defense'") "was intended to restrict, not broaden, the scope of discovery."  *In re Williams-Sonoma, Inc.*, 947 F.3d 535, 539 (9th Cir. 2020).  *See also* Fed. R. Civ. P. 26, advisory committee's note to 2015 amendment (noting that Rule 26(b)(1) was amended in 1983 in part "to encourage judges to be more aggressive in identifying and discouraging discovery overuse," that the "clear focus of the 1983 provisions may have been softened, although inadvertently, by [subsequent] amendments," and that the 2015 amendment was intended in part to "restore[] the proportionality factors to their original place in defining the scope of discovery").

and/or information: (1) the identity of ThermoLife's supplier; (2) certain communications between ThermoLife and its customers/licensees; and (3) certain other documents that "ThermoLife agreed to produce during the Feb. 8, 2021 meet and confer, but that remain unproduced with no projected production date." (Doc. 139 at 2-3.)  In addition to arguing that it is entitled to relief on the merits, HumanN asserts that ThermoLife waived any objections by failing to raise them in a timely manner.  (*Id.* at 2 n.2.)

### 1.   Waiver

HumanN's waiver argument lacks merit.[7]  To be sure, Rule 33(b)(4) of the Federal Rules of Civil Procedure provides that "[t]he grounds for objecting to an interrogatory must be stated with specificity" and "[a]ny ground not stated in a timely objection is waived unless the court, for good cause, excuses the failure."  Thus, a party waives any objection to an interrogatory "by failing timely to raise it."  *Friedman v. Live Nation Merch., Inc.*, 833 F.3d 1180, 1185 n.2 (9th Cir. 2016).  The same principles govern RFPs under Rule 34.  Although the concept of waiver/forfeiture is not enshrined in the text of Rule 34, the Ninth Circuit has recognized that, under both Rules 33 and 34, "a failure to object to discovery requests within the time required constitutes a waiver of any objection."  *Richmark Corp. v. Timber Falling Consultants*, 959 F.2d 1468, 1473 (9th Cir. 1992).

These principles do not aid HumanN here because ThermoLife's objections were not untimely.  Although HumanN's counsel originally stated (in the August 17, 2020 email) that ThermoLife could only have an extension until August 24, 2020 to respond to the interrogatories and RFPs, HumanN's counsel then stated (in the August 18, 2020 email) that "[d]iscovery can wait in the service of an agreement [to settle]."  ThermoLife could have reasonably construed this statement as agreement to vacate the August 24, 2020 deadline in light of the then-pending settlement discussions, even if HumanN did not intend

---

[7]     Although the rules and case law use the term "waiver" when referring to the consequences arising from the failure to raise timely objections to a discovery request, it would be more accurate to use the term "forfeiture" in this context.  *See generally United States v. Olano*, 507 U.S. 725, 733 (1993) ("Waiver is different from forfeiture.  Whereas forfeiture is the failure to make the timely assertion of a right, waiver is the intentional relinquishment or abandonment of a known right.") (internal quotation marks omitted).

it to have that effect.

Alternatively, even if August 24, 2020 remained the applicable deadline following this exchange—meaning that ThermoLife's effort to raise objections on October 26, 2020 was untimely—the Court would find "good cause" to excuse the failure based on (1) the ambiguities created through the email exchange and (2) the fact that ThermoLife has otherwise been responsive throughout the discovery process in this case.

### 2.    Supplier Identity

HumanN argues that the identity of ThermoLife's supplier is "highly relevant" to the issues of causation and damages.  (*Id.* at 3-8.)[8]  HumanN emphasizes that "ThermoLife bases its damages claim on a theory that, but for HumanN's advertising and patent marking, consumers would have bought dietary supplements sold by ThermoLife's own customers, thereby indirectly boosting sales of raw ingredients."  (*Id.* at 4.)  HumanN argues that, to rebut this claim, it is entitled to show that "any alleged reduction in ThermoLife's sales" was not "due *solely* to HumanN's alleged conduct" and was instead caused by problems related to ThermoLife's supplier, such as (1) the supplier's failure to register with the FDA, (2) the supplier's non-compliance with current Good Manufacturing Practices ("cGMP") applicable in the dietary supplement industry, (3) the supplier's inability to increase its production capacity to meet additional demand, and/or (4) the supplier's experiences with business disruptions related to COVID-19.  (*Id.* at 4-5.)  HumanN contends these concerns are not hypothetical because virtually all manufacturers of creatine nitrate are based in India or China and the FDA has, in recent years, found widespread fraud and manipulation of quality data in Chinese manufacturing plants.  (*Id.* at 5-6.)  HumanN also contends it shouldn't have to accept the representations of ThermoLife's counsel concerning the registration status of ThermoLife's supplier because it is entitled to verification, particularly in light of ThermoLife's alleged discovery misconduct in other cases.  (*Id.* at 6-8.)  Finally, HumanN argues that ThermoLife cannot demonstrate good cause for

---

[8]    HumanN also contends the supplier's identity is relevant to its counterclaims.  (*Id.* at 3.)

withholding this information because the identity of a supplier isn't a trade secret, confidentiality concerns related to suppliers are particularly weak in the dietary world (because consumers have a right to know what they are ingesting), and there is, in any event, a protective order already in place.  (*Id.* at 8-11.)

In response, ThermoLife argues that the identity of its supplier is irrelevant because "[t]he name of the manufacturer won't make any of HumanN's false advertising true" and "won't make it any less true that ThermoLife has lost sales as a result of HumanN's advertising."  (Doc. 153 at 3-5.)  ThermoLife also notes that HumanN didn't identify, in its disclosures under the Mandatory Initial Discovery Pilot Project ("MIDP"), any defenses related to the quality of ThermoLife's raw materials—an omission that, in ThermoLife's view, shows the current request is a fishing expedition.  (*Id.*)  Next, ThermoLife argues that the name of a dietary supplement supplier can constitute confidential information, that the cases cited by HumanN are distinguishable (because they involved drug manufacturers), and that revealing its supplier's name "might jeopardize [its] competitive advantage in the marketplace gained by working with an international supplier of raw material."  (*Id.* at 5-6.)  ThermoLife also submits a declaration from its founder, who avows that ThermoLife's supplier "is registered with the FDA."  (Doc. 153-1 ¶ 7.)  Finally, ThermoLife contends that HumanN attempted to "intentionally mislead the Court" during earlier hearings, when questioning the registration status of ThermoLife's supplier, because it is impossible to ascertain a dietary supplement manufacturer's registration status by searching the FDA's website.  (Doc. 153 at 2-3, 7-10.)

In reply, HumanN reiterates its belief that information related to ThermoLife's supplier "is necessary for HumanN to test ThermoLife's damages claim."  (Doc. 157 at 1-3.)  As for the MIDP/fishing expedition issue, HumanN argues that its MIDP disclosure explicitly raises the defense of causation in relation to damages.  (*Id.*)  Finally, as for the issue of good cause, HumanN offers some additional discussion of the cases cited in its motion and notes that ThermoLife made no effort to explain why the protective order in this case would be inadequate to guard against ThermoLife's professed concerns of

competitive harm.  (*Id.* at 3-6.)[9]

HumanN has the better side of these issues.  The first disputed issue is whether the identity of ThermoLife's supplier is relevant.  It is.  Because ThermoLife is seeking damages based on lost sales, HumanN is entitled to defend against that claim by showing there was some other cause for the allegedly lost sales.  Problems with ThermoLife's supplier—including problems related to registration status, compliance with industry standards, manufacturing capacity, and/or business disruptions—could conceivably account for ThermoLife's inability to make the additional sales it is now claiming it was prevented from making by HumanN's conduct.  The Court has no trouble concluding that the "relatively low bar" of relevance, *see Continental Circuits,* 435 F. Supp. 3d at 1018, has been crossed here.

The Court also rejects ThermoLife's contention that HumanN is seeking to embark on a proverbial fishing expedition.  Although HumanN's MIDP disclosures do not flesh out its causation defense in much detail, that defense is disclosed.  Additionally, HumanN has now identified specific reasons why it believes Chinese suppliers of nitrate products may implicate unique regulatory and registration issues.  Thus, even assuming that the identity of a plaintiff's supplier might not be relevant for discovery purposes in every case involving a claim of lost sales, it is relevant here.

Because HumanN has met its burden of establishing relevance, the burden shifts to ThermoLife to establish that discovery should be disallowed due to burden or cost. ThermoLife has not met that burden.  As an initial matter, HumanN's request for supplier information doesn't raise any concerns related to cost or proportionality.  This isn't a situation where ThermoLife is being asked to locate, gather, and produce a large mass of documents—indeed, it appears that ThermoLife inadvertently produced the name of its supplier a few months ago.  Instead, ThermoLife's theory is that disclosing its supplier's identity to HumanN would result in competitive harm.  Specifically, ThermoLife's founder

---

[9]     HumanN also alludes to a deposition transcript from a different lawsuit in which one of ThermoLife's customers purportedly "refused to buy ThermoLife's 'defective' ingredients because of quality issues." (Doc. 157 at 3.)  As discussed in Part III *infra*, the Court did not consider this evidence when ruling on the motion to compel.

states in his declaration that:

> [T]he identity of ThermoLife's Supplier is confidential information that could be used . . . by a competitor to put ThermoLife at a competitive disadvantage. For example, competitors could use the name of ThermoLife's supplier to attempt to manufacture competing products, which could be sold in the United States or in other parts of the world where patent protections are not available. Customers could also use the identity of ThermoLife's supplier to obtain detailed pricing information. Furthermore, ThermoLife also currently working [on] developing new and novel ingredients with the help of its supplier. This information is not public and disclosure of the supplier's name could jeopardize this work.

(Doc. 153-1 ¶ 4.)

These arguments are unpersuasive because they fail to account for the protective order that is already in place in this action. Under the protective order, HumanN cannot run amok with ThermoLife's supplier information and start using it for business reasons. (Doc. 35 at 9 ["A Receiving Party may use Protected Material that is disclosed or produced by another Party or by a Non-Party in connection with this case only for prosecuting, defending, or attempting to settle this litigation."].) Nor would the production of this information to HumanN, pursuant to the protective order, necessarily result in it being dumped into the public record so others could begin using it to ThermoLife's detriment. (*Id.* at 17 ["Without written permission from the Designating Party or a court order secured after appropriate notice to all interested persons, a Party may not file in the public record in this action any Protected Material."].) Thus, regardless of whether the identity of ThermoLife's supplier is properly considered confidential or trade secret information that may be redacted from public filings—an issue addressed in Part II below—such characterization has no bearing on whether ThermoLife would suffer competitive harm simply from disclosing it to HumanN pursuant to a protective order. *See generally Facciola v. Greenberg Traurig LLP*, 2011 WL 5244945, *1 (D. Ariz. 2011) ("The mere fact that the documents may contain confidential, third-party financial information does not make them undiscoverable, particularly here where a protective order is in place.").[10]

---

[10] Ironically, ThermoLife acknowledges this distinction in its motion to seal. (Doc. 156 at 2 ["The issue here is not whether HumanN's counsel is entitled to know the identity

Finally, although the Court appreciates that ThermoLife has now submitted competent evidence—in the form of a sworn declaration from its founder—that the supplier at issue is registered with the FDA, HumanN is entitled to know more than the mere fact of registration. As discussed, HumanN's potential causation defense may turn on other aspects of the supplier's business, including whether it complies with cGMP, its manufacturing capacity, and how it weathered COVID-19. To explore these issues, HumanN must know its name.

For these reasons, HumanN's motion to compel ThermoLife to disclose the name of its supplier is granted. In light of this ruling, ThermoLife's previous request for sanctions—which the Court held in abeyance pending the resolution of the motion to compel—is denied.

### 3. Communications

HumanN also seeks to compel the production of certain communications between ThermoLife and its customers/licensees. It is undisputed that ThermoLife has already produced a subset of these materials—specifically, (1) all of the demand and cease-and-desist letters "sent by ThermoLife's attorneys asserting that a company infringed one of ThermoLife's patents" (Doc. 153 at 10), of which there are apparently more than 100 (Doc. 154 at 24-25), and (2) all of the patent licenses at issue in those other disputes. The parties disagree about whether ThermoLife also should be required to produce the response letters it received from the customers/licensees who it accused of infringement.

HumanN contends these response letters are relevant to its antitrust, Arizona Patent Troll Prevention Act ("PTPA"), and tortious inference counterclaims because they will show that ThermoLife "was repeatedly advised its allegations of infringement were meritless" yet "continued to raise similarly frivolous claims notwithstanding this knowledge." (Doc. 139 at 12-14.)

---

of ThermoLife's supplier. That question is before the Court on HumanN's Motion to Compel. Here, HumanN has taken its request a step further: HumanN asserts that the documents that identify ThermoLife's supplier as well as ThermoLife's pricing information, including the costs ThermoLife pays for the products it sells, should be filed publicly."].)

ThermoLife raises two arguments in response.  (Doc. 153 at 10-12.)  First, ThermoLife argues that because the response letters are only relevant to HumanN's antitrust counterclaim, which it has moved to dismiss, HumanN's discovery request should be deferred pending the resolution of the motion to dismiss.  (*Id.* at 10-11 & n.5.)  Second, ThermoLife raises a relevance objection, arguing that "the back-and-forth that ThermoLife has had with companies that infringe its patents . . . do[es] not make HumanN's allegations of patent trolling any more or less true."  (*Id.* at 11.)  In a related vein, ThermoLife argues that because HumanN already has all of the underlying patent paperwork on which ThermoLife's infringement claims in the other cases were based, it can make its own determination whether those claims were frivolous (and doesn't need to response letters to evaluate that issue).  (*Id.* at 11-12.)

In reply, HumanN argues that the pendency of a motion to dismiss is not a valid basis for refusing to engage in the discovery process and that the letters are relevant because "[s]ome of the[] recipients . . . likely responded to ThermoLife's threats with explanations as to why its patents are invalid and/or its theories of infringement [are] flawed" and if ThermoLife was "given such actual notice that its claims are meritless," such notice would be "germane to whether ThermoLife's subsequent actions against others . . . were in 'good faith,' or part of a pattern giving rise to Sherman Act liability."  (Doc. 157 at 6-7.)

HumanN again has the better side of these issues.  As an initial matter, ThermoLife's efforts to seek dismissal of HumanN's antitrust counterclaim did not entitle ThermoLife to refuse to engage in the discovery process related to that counterclaim pending the resolution of the dismissal motion.  *Ocean Garden Prods. Inc. v. Blessings Inc.*, 2020 WL 4284383, *3 (D. Ariz. 2020) ("The notion that discovery is automatically stayed upon the filing of a dismissal motion is not supported by the Federal Rules of Civil Procedure and is directly at odds with the need for expeditious resolution of litigation.") (internal quotation marks omitted).  Moreover, HumanN contends the response letters are also relevant to its counterclaims for tortious interference and under PTPA, the latter of which isn't subject to a motion to dismiss.

On the merits, it is again notable that ThermoLife's objection to HumanN's discovery request is not rooted in concerns over cost or proportionality—instead, it is a straight relevance challenge. The Court agrees with HumanN that the response letters are relevant. If, as HumanN posits, ThermoLife was repeatedly notified by customers and licensees over a period of eight years that its theories of patent infringement were baseless yet kept promulgating such claims after receiving such notice, this pattern of dealing could shed light on whether ThermoLife acted with the requisite state of mind to incur liability on HumanN's antitrust and PTPA counterclaims (and could, at least potentially, serve as Rule 404(b) evidence with respect to HumanN's tortious inference counterclaim, because that claim is also premised on the theory that ThermoLife asserted a bad-faith claim of patent infringement).[11] Although ThermoLife asserted during oral argument that the patent infringement allegations addressed in the letters are too factually dissimilar from HumanN's existing counterclaims to qualify as Rule 404(b) evidence, this overlooks that "discovery is concerned with relevant information—not relevant evidence—and that as a result the scope of relevance for discovery purposes is necessarily broader than trial relevance." Gensler, *supra*, Rule 26, at 801-02. The receipt of denial-of-liability letters would not, of course, be dispositive as to ThermoLife's intent—it seems unlikely that a company would, upon receipt of a demand letter accusing it of patent infringement, respond by immediately writing a letter admitting liability. Nevertheless, to be relevant, the response letters need only "bear[] on or . . . reasonably lead to information that bears on any material fact or issue in the action." *Id.* Such is the case here.

### 4.  Other Documents

On Friday, February 12, 2021, ThermoLife's counsel wrote an email to HumanN's counsel in which he "confirm[ed]" that ThermoLife would produce seven categories of documents to HumanN "next week." (Doc. 139-8 at 2-3.) The seven categories were as

---

[11]     As it turns out, the Court has now issued, concurrently with this order, a separate order granting ThermoLife's motion to dismiss HumanN's antitrust counterclaim without leave to amend. Nevertheless, the letters remain relevant to other pending counterclaims and, as discussed above, ThermoLife was not entitled to pause the discovery process related to the antitrust counterclaim simply because a motion to dismiss was pending.

follows: (1) a report showing ThermoLife's "profit over time on its sales"; (2) a particular patent license; (3) communications with customers/licensees related to changes in sales figures; (4) communications with customers/licensees related to the invalidity of ThermoLife's patents; (5) a list of customers/licensees that allegedly lost sales due to HumanN's conduct; (6) post-2015 deposition transcripts for ThermoLife employees and members in cases not involving patent infringement claims; and (7) documents related to any offers by ThermoLife to "police the market." (*Id.*) However, the promised production did not occur by the end of the next week. Instead, on the first day of the following week (Monday, February 22, 2021), ThermoLife's counsel sent another email explaining that "I am continuing to work with the client to get the documents and information that we indicated that we would produce, produced." (*Id.* at 2.)

In the final section of its motion—which was filed on February 26, 2021—HumanN moves to compel ThermoLife to produce these seven categories of documents. (Doc. 139 at 2, 14-15.) HumanN argues that the documents are overdue and contends that, because ThermoLife's most recent email "gave no hint *when* this production would actually occur," the Court should step in and "Order ThermoLife to produce these documents immediately." (*Id.*)

ThermoLife addresses this issue in only cursory fashion in its response. It argues the issue is moot because it "completed this production" at the same time it filed its response (*i.e.,* on March 12, 2021). (Doc. 153 at 2.)

In reply, HumanN argues that ThermoLife's discovery production on March 12, 2021 was incomplete because it only involved 79 documents, didn't include any of the documents falling within categories (3), (4), and (7) above, didn't include the exhibits to the deposition transcripts called for in category (6), and didn't identify the methodology used to calculate the lost sales called for in category (5). (Doc. 157 at 7-9.)

HumanN's motion to compel ThermoLife to produce the documents discussed in the February 12, 2021 email is denied without prejudice. This is because the record is inadequate to evaluate the parties' competing claims as to the adequacy of ThermoLife's

1   March 12, 2021 production.  ThermoLife says it was complete, HumanN says it wasn't,

2   and neither side has submitted evidence to support its position.  Further meeting and

3   conferring is necessary before this issue is ripe for resolution (and it is the Court's sincere

4   hope that it can be resolved without further judicial involvement).

5               5.      Attorneys' Fees And Costs

6          Both parties contend they are entitled to recover the attorneys' fees and costs they

7   incurred in relation to the motion to compel.  (Doc. 139 at 15-17; Doc. 153 at 12-13.)

8          Because HumanN's motion is being granted in part and denied in part, the

9   availability of fees and costs is governed by Rule 37(a)(5)(C) of the Federal Rule of Civil

10  Procedure.  It provides that "[i]f the motion is granted in part and denied in part, the court

11  . . . may, after giving an opportunity to be heard, apportion the reasonable expenses for the

12  motion."  *Id.  See generally W. Mortg. & Realty Co. v. KeyBank Nat'l Ass'n*, 2016 WL

13  11643651, *1 (D. Idaho 2016) ("Plaintiff cites to Rule 37(a)(5)(A) in its request for fees,

14  but . . . Rule 37(a)(5)(C) is the applicable subsection of the Rule because the motion was

15  not granted in full.  The primary difference between these two subsections is that an award

16  is discretionary under Rule 37(a)(5)(C).  Ultimately, the analysis of Plaintiff's request

17  under subsection 37(a)(5)(A) or 37(a)(5)(C) is the same, and arguments pertaining to the

18  exceptions to Rule 37(a)(5)(A) are equally applicable to the Court's determination of

19  whether attorney fees should be apportioned under Rule 37(a)(5)(C).").

20         The Court chooses, in its discretion, to award attorneys' fees and costs to HumanN.

21  HumanN prevailed on the main disputed issues (supplier identity and response letters) and

22  ThermoLife staved off a definitive ruling in HumanN's favor on the third issue (documents

23  discussed in the February 12, 2021 email) only by making a belated production after

24  HumanN filed its motion.  *Cf.* Fed. R. Civ. P. 37(a)(5)(A) (costs and fees are ordinarily

25  awarded to the movant if "the disclosure or requested discovery is provided after the

26  motion was filed").  Additionally, HumanN undertook good-faith efforts to obtain the

27  disputed materials without court action and no other circumstances would make an award

28  of expenses unjust.  *Id.*  Finally, although ThermoLife asserted during oral argument that

1   the Court should decline to award fees because its positions were "substantially justified"

2   (and pointed to the Court's unwillingness to issue a definitive ruling during the February

3   3, 2021 hearing as proof of such substantial justification), the relevance of the supplier's

4   identity and the response letters was not, in the final analysis, a particularly close call.

5   Additionally, ThermoLife made no effort whatsoever to account for the protective order

6   when raising its assertions of competitive harm related to the supplier's identity.  Although

7   cost shifting is not automatically required whenever a motion to compel is granted (or

8   granted in significant part), it is appropriate here.  HumanN shouldn't have been forced to

9   file a motion to compel to obtain these materials.[12]

10  II.     Motion To Seal

11          As noted, on March 4, 2021, the parties asked the Court to resolve a discovery

12  dispute related to ThermoLife's inadvertent disclose of the name of its supplier.  (Doc.

13  143.)   As part of that proceeding, HumanN lodged, under seal, certain unredacted

14  documents containing the supplier's name.  (Doc. 144.)  ThermoLife has now moved for

15  permission to file the lodged documents under seal.  (Doc. 156.)

16          The public has a general right to inspect judicial records and documents, such that

17  a party seeking to seal a judicial record must overcome "a strong presumption in favor of

18  access."  *Kamakana v. City & County of Honolulu*, 447 F.3d 1172, 1178 (9th Cir. 2006)

19  (internal quotation marks omitted).   To do so, the party generally must "articulate

20  compelling reasons supported by specific factual findings that outweigh the general history

21  of access and the public policies favoring disclosure."  *Id.* at 1178-79 (cleaned up).  The

22  Court must then "conscientiously balance the competing interests of the public and the

23  party who seeks to keep certain judicial records secret."  *Id.* at 1179 (cleaned up).  "After

24  considering these interests, if the court decides to seal certain judicial records, it must base

25  its decision on a compelling reason and articulate the factual basis for its ruling, without

26  ───────────────
    [12]     The parties are ordered to meet and confer as to the amount of attorneys' fees and
27  costs to which HumanN is entitled.  If the parties cannot resolve the matter, HumanN may
    file a motion (and supporting evidence).  The motion must address both the amount of fees
28  sought and whether the fees should be assessed against ThermoLife, ThermoLife's counsel,
    or both.  ThermoLife's response must be filed within 14 days of the motion.  No reply may
    be filed.

1    relying on hypothesis or conjecture." *Id.* (internal quotation marks omitted).

2    The "stringent" compelling reasons standard applies to all filed motions and their

3    attachments where the motion is "more than tangentially related to the merits of a case."

4    *Ctr. for Auto Safety v. Chrysler Grp., LLC*, 809 F.3d 1092, 1096, 1101 (9th Cir. 2016).

5    However, a lower standard applies to "sealed materials attached to a discovery motion

6    unrelated to the merits of a case," which requires only that a party establish "good cause"

7    for sealing. *Id.* at 1097.

8    ThermoLife argues that the lower "good cause" standard applies here because its

9    sealing request relates to a discovery motion.  (Doc. 156 at 2.)  The Court agrees.  The

10   Court further agrees with ThermoLife that the "good cause" standard has been satisfied.

11   In *Diversified Industries, Inc. v. Vinyl Trends, Inc.*, 2016 WL 6897783 (D.N.J. 2016), the

12   court granted the plaintiff's request to "redact the name of a supplier of the raw material

13   [it] uses" because the plaintiff had submitted a declaration "establish[ing] that the revealing

14   of Plaintiff's supplier's name might jeopardize Plaintiff's competitive advantage in the

15   marketplace gained by working with an international supplier of raw material." *Id.* at *4.

16   Similarly, here ThermoLife's founder has submitted a declaration explaining why the

17   public disclosure of its supplier's name—as contrasted with private disclosure of the name,

18   to HumanN only, for the limited purpose of litigating this action—could result in

19   commercial harm.  (Doc. 156-1.)  Many, albeit not all, courts have found that sealing of a

20   supplier's name is appropriate in this circumstance.  *See, e.g.*, *Uni-Systems, LLC v. U.S.*

21   *Tennis Ass'n, Inc.*, 2019 WL 3753780, *5 (E.D.N.Y. 2019) ("Exhibit D contains pricing

22   information and supplier lists, which fall under the scope of trade secrets . . . . , providing

23   sufficient good cause to maintain the confidentiality of the information, outweighing the

24   public's presumptive right of access, and pursuant to the Federal Rules of Civil Procedure

25   Rule 26(c) may be filed under seal."); *In re Gabapentin Patent Litig.*, 312 F. Supp. 2d 653,

26   660 (D.N.J. 2004) (affirming magistrate judge's decision to seal supplier's name from

27   summary judgment papers, where magistrate judge found that "information regarding raw

28   material suppliers is also kept as a trade secret").  *But see Panther Sys., II, Ltd. v. Panther*

*Comp. Sys.*, 783 F. Supp. 53, 70 (E.D.N.Y. 1991) ("In general, the identity of suppliers is not a trade secret entitled to protection since they can be readily learned in any productive industry.").

III.   Motion For Leave To File A Sur-Reply

In its reply in support of its motion to compel, HumanN alluded to a deposition transcript from a different lawsuit in which one of ThermoLife's customers purportedly "refused to buy ThermoLife's 'defective' ingredients because of quality issues." (Doc. 157 at 3.)   HumanN proffered this deposition transcript as proof that its causation-related arguments weren't a fishing expedition.  (*Id.*)

ThermoLife objects to HumanN's proffer of this deposition transcript and requests leave to file a sur-reply so it may address the deposition transcript in more detail.  (Doc. 162.)   Alternatively, ThermoLife asks that the offending portion of HumanN's reply be stricken.  (*Id.*)   According to ThermoLife, the reference to the transcript was improper because it constituted an attempt to "introduce[] new evidence or arguments for the first time in a reply."  (*Id.* at 2.)   HumanN disagrees, arguing that (1) ThermoLife's motion is procedurally improper, because ThermoLife included the proposed sur-reply with its request; and (2) ThermoLife's objections fail on the merits because the deposition transcript was properly offered in rebuttal to the "fishing expedition" arguments raised in ThermoLife's response to the motion to compel.  (Doc. 163 at 2-4.)

On the one hand, when "new evidence is presented in a reply . . . the district court should not consider the new evidence without giving the [non-]movant an opportunity to respond."  *Provenz v. Miller*, 102 F.3d 1478, 1483 (9th Cir. 1996) (second alteration in original) (internal quotation marks omitted).  On the other hand, "[w]hile a party may not file 'new' evidence with a reply, it may file 'rebuttal' evidence to contravene arguments first raised by the non-moving party in its opposition. . . .  District of Arizona precedent is clear . . . that it is immaterial that [the movant] already had this evidence in its possession at the time it filed is motion . . . , so long as it is rebuttal evidence."  *TSI Inc. v. Azbil BioVigilant Inc.*, 2014 WL 880408, *1 (D. Ariz. 2014).

Here, it is unnecessary to decide whether the evidence to which HumanN alluded in its reply constituted "new" or "rebuttal" evidence because, as discussed in footnote nine above, that evidence did not affect the outcome of the motion to compel.  ThermoLife's request for leave to file a sur-reply is therefore denied.  *JG v. Douglas Cnty. Sch. Dist.*, 552 F.3d 786, 803 n.14 (9th Cir. 2008) ("The district court did not consider the new evidence and its denial of leave to file a sur-reply accordingly did not prejudice Appellants.").  Nor is it necessary to "strike" the challenged evidence in this circumstance, as ThermoLife alternatively requests.  *AIRFX.com v. AirFX LLC*, 2012 WL 129804, *1 (D. Ariz. 2012) ("Defendant moves to strike plaintiffs' reply . . . , arguing that the reply raises new arguments. . . .  [A] motion to strike in this case is unnecessary, as we do not consider new arguments raised in a reply.").

Accordingly, **IT IS ORDERED** that:

(1)     HumanN's motion to compel (Doc. 139) is **granted in part and denied in part**.  ThermoLife must produce the items at issue within 14 days of the issuance of this order.

(2)     ThermoLife's motion to seal (Doc. 156) is **granted**.  The Clerk of Court shall file, under seal, the documents lodged at Docs. 144-1, 144-2, and 144-3.

(3)     ThermoLife's motion for leave to file a sur-reply (Doc. 162) is **denied**.

Dated this 14th day of April, 2021.

Dominic W. Lanza
United States District Judge